NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0612n.06

No. 12-2559

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 08, 2014
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,      )
                               )
    Plaintiff-Appellee,        )  ON APPEAL FROM THE
                               )  UNITED STATES DISTRICT
    v.                         )  COURT FOR THE EASTERN
                               )  DISTRICT OF MICHIGAN
JONATHAN AGBEBIYI,             )
                               )
    Defendant-Appellant.       )
                               )

_____

BEFORE: GRIFFIN and DONALD, Circuit Judges; GRAHAM, District Judge.[*]

GRAHAM, District Judge. Defendant-Appellant Jonathan Agbebiyi was charged by a third superseding indictment returned in the United States District Court for the Eastern District of Michigan with one count of conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1349 and 1347 (Count 1), and six counts of health care fraud in violation of § 1347 (Counts 2 through 7). Other co-conspirators also named in the original indictment filed in this case pleaded guilty. The case against Agbebiyi was tried to a jury, and he was convicted on five counts of health care fraud and the conspiracy charge. He now appeals his conviction on the

_____

[*] The Honorable James L. Graham, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

conspiracy charge and his sentence. For the reasons that follow, we AFFIRM the judgment and sentence of the district court.

## I. Background

Medicare Part B is federal health insurance which covers physician charges and diagnostic tests. In Michigan, Medicare Part B is administered by Wisconsin Physician Service ("WPS"), a Medicare contractor. Medicare contractors are responsible for processing and reimbursing claims on behalf of Medicare beneficiaries, and for enrolling physicians and group clinics as providers. The provider application form includes a certification that the applicant will submit claims truthfully and accurately. Medicare claims must be for services which are medically necessary. Providers are responsible for knowing the Medicare rules and regulations, and for submitting claims in accordance with those regulations. Physicians commonly reassign their billed Medicare benefits to the clinic or entity for which they work. A physician who becomes a Medicare provider must sign a form which puts him on notice of Medicare rules and regulations, and attests that the physician is responsible for the truth and accuracy of any claims submitted under his Medicare provider number. A physician provider is responsible for the billing of services under his provider number even if someone else prepares the billing. WPS provides welcome packets to providers, advises them about provider

2

accountability for claims submitted on their behalf and how to report suspected fraud, and offers documents, educational programs, newsletters, and a toll-free phone number for questions. If fraudulent activity is detected, WPS refers the matter to Trust Solutions for investigation.

In 2007, Karina Hernandez moved from Miami, Florida, to the Detroit, Michigan, area. Hernandez, who had a high-school education, planned to open a clinic for the purpose of providing diagnostic testing which could be billed to Medicare. Hernandez admitted that she opened the clinic for the purpose of defrauding Medicare. Marieva Briceno (Hernandez's mother), Juan Villa (Hernandez's brother-in-law), Dora Binimelis and Emilio Haver were also involved in this scheme.

Hernandez first opened Blessed Medical Clinic ("Blessed"), in Livonia, Michigan, with the assistance of her mother and Dora Binimelis. Hernandez later opened the Alpha & Omega Medical Clinic ("Alpha & Omega") and the Manuel Medical Clinic ("Manuel"). Binimelis provided the diagnostic equipment that was used in the clinic. All three clinics were located in the same building and shared equipment. The Medicare application submitted for Blessed listed Juan Villa as the contact person. Hernandez was listed as the contact person on the Medicare application for Alpha & Omega, and Henry Briceno was listed as the contact person on the Medicare

3

application for Manuel.  Juan Villa was approached by Hernandez about being the owner of Blessed on paper because he had no prior involvement with a clinic and no criminal record, thereby reducing the risk that Medicare would investigate them.

In order to bill Medicare, the clinics were required to employ doctors to work at the clinics.  The clinics provided the doctors with forms to order diagnostic tests, such as EKGs and nerve conduction tests.  Dr. Alfonso Acosta, a general family physician, worked briefly at Blessed in the fall of 2007.  He was interviewed for the position by Hernandez, who showed him the clinic's diagnostic equipment, including machines for administering the Doppler test and nerve conduction tests.  Hernandez pressured him to order tests.  Acosta also observed Alejandro Haver, the son of Emilio Haver, instruct clinic employees to conduct additional tests which he had not ordered.  As a general practitioner, Acosta had asked a specialist on two or three occasions to do a nerve conduction test, but had not previously performed these specialized tests himself, and had never ordered a Doppler test.

Doctor Agbebiyi, who specialized as a gynecologist, obstetrician and general family doctor, worked for the clinics from April, 2008, through January 15, 2010.  Hernandez interviewed Agbebiyi for the position and gave him a tour of the clinic to show him the diagnostic equipment.  Hernandez explained to Agbebiyi that

4

after he had seen a patient, the patient would be referred for diagnostic tests. According to the Government, Agbebiyi ordered numerous diagnostic tests without any legitimate medical purpose so that the clinic could generate profits from Medicare reimbursement revenues. Agbebiyi worked for the clinics on a part-time basis from April of 2008 to January of 2010, and was paid $100 per hour. After Hernandez opened Manuel, Agbebiyi agreed to work there for his hourly rate plus fifteen percent of the total amount being billed by the three clinics.

The clinics employed drivers who were paid to find patients who were Medicare-eligible and bring them to the clinics. The goal was to make money for the clinics when the clinics' doctor referred patients for diagnostic tests. The drivers were organized by Hernandez's husband, Santiago Villa. Isaac Carr, one of the drivers used by the clinics, testified that he would go to soup kitchens and recruit persons who had a Medicare card to go to the clinics for cash. Carr was paid $50 for every patient he brought to the clinic, and the patient was also paid $50. Patients were delivered to the clinics in groups, and were at the clinics from two to eight hours, where Juan Villa would provide fast food to these individuals while they were waiting to see the doctor. Agbebiyi knew that the clinics paid a driver to bring in patients.

5

The patients were coached to say they had certain symptoms, such as lower back pain, headaches, or swollen knees. Onthaus Madden, a patient at Alpha & Omega, went to the clinic once a month because she was paid money by the driver, was given food, and received paid prescriptions. Madden testified that she was instructed by the receptionist to complain about her knees. At trial, Madden stated that a doctor with an African name told her that she was required to take the diagnostic nerve tests as her treatment. Dr. Agbebiyi billed Medicare for eighteen nerve conduction studies administered to Madden. No one from the clinic ever called Madden to talk to her about the results of these tests.

Ultrasound tests were performed at the clinics by Kim Seung Hee, a certified ultrasound technician who worked at the clinics for seven to eight months until June, 2009. Hee testified that some patients stated they came to the clinic for prescriptions, and objected or threatened her when she started to perform the ultrasound tests ordered by Agbebiyi. On those occasions, Agbebiyi instructed her to go ahead and do the tests. Occasionally when she informed Agbebiyi that a patient had received ultrasound tests within the past two or three months for which no results had been received, Agbebiyi instructed her to go ahead and perform the test anyway. Hee observed diagnostic tests being performed at the clinic even when no doctor was present. Hernandez and Juan Villa

6

forced her to perform ultrasounds even when Agbebiyi was not there. When Hee informed Agbebiyi about this, he would look at the chart, see the patient, and tell her to do the ultrasound.

The diagnostic test results were sent to a group of doctors in Miami, Florida, for interpretation. Hee observed ultrasound test results from Florida in cases where the pictures were not taken properly by another technician. She cited two examples involving test result reports which stated that a kidney or the thyroid looked normal, but the corresponding ultrasound pictures were not of those organs. Agbebiyi told Hee not to let Lynn, the other technician, do the ultrasounds.

Jasmine Oliver also worked at the clinics. She had a high-school education, and her sole medical training consisted of one phlebotomy (blood-drawing) class in trade school. Oliver's job included interviewing patients about their health complaints, taking their vital signs, and doing blood pressure readings. Oliver also administered transcranial Doppler tests, pulmonary function tests, nerve conduction velocity tests, and vestibular tests. Oliver had no prior training in administering diagnostic tests, and was taught by Juan and Santiago Villa how to use the diagnostic equipment. When test results came back from Florida, Oliver put them in the patient files and put the files on

7

Agbebiyi's desk, and after Agbebiyi had reviewed the files, which she often observed him do, she put them away.

The clinic used a form prepared by Alejandro Haver which listed symptoms corresponding to the various diagnostic tests available at the clinics. Oliver used a complaint sheet to record the patients' symptoms, which almost always included radiating back pain. She noted the tests which a patient had not yet had or was eligible to have on a sticky note, then attached the note to the patient's chart before giving the chart to Agbebiyi. Agbebiyi commonly ordered diagnostic tests, and agreed with the test recommendations she wrote on the sticky notes more than half the time. Oliver was sometimes told by Agbebiyi to go ahead and perform the diagnostic tests even if he was going to be late in arriving at the clinics. Tests were administered based on Oliver's initial assessment before Agbebiyi arrived at the clinic in the afternoon. Hernandez would also ask Agbebiyi to order certain tests, and the majority of the time, Agbebiyi would then order those tests. On one occasion, Oliver informed Agbebiyi that she had seen Hernandez mark an "X" on the complaint sheet as Oliver was taking the file to the doctor, and Agbebiyi responded that he would make a mental note of it. Juan Villa would also ask Agbebiyi to order tests, and would call his attention to tests he had not yet

8

ordered, and most of the time, Agbebiyi would agree to order the tests.

After seeing a patient, Agbebiyi would tell Oliver which tests were ordered for the patient, and would give her the patient's prescriptions. The prescriptions were given to her rather than to the patients because the patients would leave before taking the tests if the prescriptions were given to them directly. Many patients also complained to Agbebiyi about having to take the tests. They received their prescriptions for drugs such as Vicodin, Metformin, and Xanax after taking the tests.

At trial, the government presented the testimony of Dr. James Teener, M.D., a neurologist with board certifications in neuromuscular and electrodiagnostic medicine. Dr. Teener explained that a nerve conduction test involves placing electrodes on the skin at the location of specific muscles under study. The electrodes are connected to a computer. The nerve is stimulated with an electrical impulse, and the result of exciting the nerve is recorded. The study is designed by the physician, although the test can be performed by a technologist. The technologist must complete six months of observational training and another three to four months of work with intense supervision before being permitted to give the test independently. Usually obstetricians are not trained in nerve conduction studies. Teener's usual practice is to

9

remain in or near the room to observe the administration of the test and to explain the results to the patient.

Teener testified that, as a nerve specialist, he orders a nerve conduction study for one-half to two-thirds of his patients, but that it is very uncommon to administer a nerve conduction study repeatedly to the same patient. He examined nerve conduction test results in fifteen to twenty patient files from the clinics, and found that none of the tests were done properly. Nerve conduction studies are almost always done in conjunction with a needle electromyography test, which is typically done at the same visit as the nerve conduction test and involves the discomfort of inserting a needle into the muscle. The needle examination was not done in any of the patient files he reviewed.

Teener also testified that the transcranial Doppler test, an ultrasound test used to evaluate the velocity of blood flow within the brain, is infrequently administered because the test is inaccurate and CAT scans and MRIs give a picture of what the blood vessels look like. The transcranial Doppler test would not be an appropriate test for someone complaining of a headache.

Medicare records showed that the three clinics billed Medicare for approximately $6.7 million during the total time of their operation. Medicare was billed for 537 patients under Agbebiyi's provider number for services dating from April 29, 2008, through

10

January 29, 2010. Ninety-three percent of Agbebiyi's patients (499 patients) received surface nerve conduction tests. Medicare was billed $2,265,665 for these tests, and Medicare reimbursed the clinics for $1,125,634. Claims were submitted to Medicare for sixty-nine percent of Agbebiyi's patients (372 patients) for transcranial Doppler tests in the amount of $178,702, and Medicare reimbursed those claims in the amount of $88,171. Only one patient out of the 537 patients seen by Agbebiyi did not receive either the nerve conduction or transcranial Doppler test. Medicare was also billed under Agbebiyi's provider number for H-Reflex studies in the amount of $97,650, and Medicare reimbursed these claims in the amount of $38,686. The claims submitted for these three tests totaled $2,542,017, and Medicare reimbursed the clinics for the three tests in the amount of $1,252,491.

These three tests were just a fraction of the types of tests ordered by Agbebiyi. For example, the record indicates that from July 1, 2008, through November 23, 2009, Blessed and Manuel billed Medicare $14,540.24 under Agbebiyi's provider number for office visits and tests which included venipuncture, electrocardiogram, nystagmus tests, a caloric vestibular test, and oscillating tracking test, a sinusoidal rotational test, and an electro-oculography test.

In April of 2008, Agbebiyi received his first payment from the clinics, made payable in his name. From May, 2008, through January, 2010, the payments were made by the clinics to Harmony International. Agbebiyi is the agent for Harmony Health Choice, and he worked at the Harmony International Clinic. In his individual capacity and in his capacity with Harmony International, Agbebiyi was paid a total of $183,476.69 by the clinics from April, 2008, through January, 2010. A chart showing a combination of the payments to Agbebiyi and Harmony International from bank records along with the payments by Medicare to the three clinics showed that Medicare paid $1,258,277.18 to Blessed, $1,043,948.64 to Alpha & Omega, and $679,803.37 to Manuel, resulting in a total of $2,982,029.19.

On May 11, 2012, the jury returned a verdict of guilty on Counts 1 through 5 and Count 7, and Count 6 was dismissed upon the government's motion.

A sentencing hearing was held on November 6, 2012. In the presentence investigation report ("PSR"), the probation officer concluded that Agbebiyi joined the conspiracy in April, 2008, and was employed by the clinics for approximately eighteen months. In calculating the base offense level under the advisory United States Sentencing Guidelines ("the Guidelines") the probation officer determined that the amount of actual loss was $2,982,029.19,

stating that this was the amount paid to the three clinics "as a result of the fraudulent claims attributed to the defendant." PSR ¶¶ 26-27. The probation officer's calculations resulted in a total offense level 28, Criminal History Category I, with a sentencing range of 78 to 97 months. Defense counsel agreed with the probation officer's calculation of the applicable range. After addressing the sentencing factors contained in 18 U.S.C. §3553(a), the district court deviated downward from the range established under the Guidelines, and imposed a sentence of sixty months incarceration on each count to be served concurrently. The district court also ordered the payment of restitution in the amount of $2,982,029.19, as a joint and several obligation with Agbebiyi's co-conspirators. The judgment filed on November 14, 2012, also directed the forfeiture of $183,476.69 from Agbebiyi, representing the amount of unlawful proceeds which he personally profited from the fraud.

A timely notice of appeal was filed on November 28, 2012.

## II. ARGUMENTS

In this appeal, Agbebiyi asserts three claims of error: (1) the trial court committed plain error in failing to specifically find the amount of loss attributable to him after he joined the conspiracy; (2) his sentence violated the Sixth Amendment because the amount of loss used in determining the

13

Guidelines base offense level enhancement and the amount of restitution was not found by the jury; and (3) he is entitled to a judgment of acquittal on the conspiracy charge.

### A. Calculation of Amount of Loss

In the PSR, the probation officer noted that the total amount billed by the three clinics to Medicare exceeded $5.4 million. The probation officer further found that Medicare suffered a loss in the amount of $2,982,029.19, which was the amount paid by Medicare to the three clinics, as documented in Government's Exhibit 18. In calculating the Guidelines sentencing range, the probation officer used the $2,982,029.19 figure as representing "the amount that Medicare actually paid out as a result of the fraudulent claims attributed to the defendant." PSR, ¶ 27. This loss determination resulted in an eighteen-level enhancement of the base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(J), which is applicable where the amount of loss is over $2.5 million but less than $7 million. In commenting on the statutory sentencing factors, the probation officer observed, "The nearly three million dollars in loss[] is a direct result[] of the defendant's billings to Medicare." PSR, ¶ 86. At sentencing, Agbebiyi did not object to the probation officer's loss determination or to the application of the eighteen-level enhancement. He now argues for the first time on appeal that

14

the district court erred in failing to determine the amount of loss specifically attributable to him after he joined the conspiracy.

Agbebiyi argues that the amount of loss should be the $1,265,543 paid to the clinics for three types of tests (nerve conduction, transcranial Doppler, and H-Reflex) which he ordered. The probation officer based the loss determination on the $2,982,029.19 figure in Government's Exhibit 18, concluding that this figure represented the amount Medicare paid on claims submitted under Agbebiyi's provider number. Although both the government and Agbebiyi raised no objection below to the probation officer's use of this amount actually paid to the clinics by Medicare as the loss figure, the probation officer could have based loss on the amount of the bills, *i.e.*, the intended loss. *See* U.S.S.G. § 2B1.1 cmt. n. 3(A) (loss is typically the greater of actual loss or intended loss). *See also United States v. Martinez*, 588 F.3d 301, 326-27 (6th Cir. 2009)(holding that actual loss consisting of payments actually made to doctor and intended loss in the amount of bills submitted by doctor were properly included in the loss calculations).

Although the government states that the amount of the claims was $5.4 million, there was also testimony that the total amount billed by the clinics during the total time of their operation was $6.7 million. The $5.4 million figure may be the amount billed

15

during the twenty months Agbebiyi worked at the clinics. As noted by the government, the amount claimed by the clinics for the nerve conduction, transcranial Doppler and H-Reflex tests ordered by Agbebiyi was $2,542,017. This amount alone is sufficient to satisfy the $2.5 million threshold required for the eighteen-level enhancement. Agbebiyi also ordered other types of tests. Where losses are not easy to quantify, the court is only required to make a reasonable estimate of the loss, given the available information, and such estimates need not be determined with precision. *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006); *see also United States v. Greco*, 734 F.3d 441, 446-447 (6th Cir. 2013)(a reasonable estimate of loss is sufficient, and the court's loss determination is entitled to appropriate deference). The amount that Agbebiyi was paid while he worked for the clinics (his personal financial gain) is not the preferred measure of loss because it ordinarily underestimates the loss. *Triana*, 486 F.3d at 323; U.S.S.G. § 2B1.1 cmt. n. 3(B).

We note, moreover, that Agbebiyi has waived his right to challenge the eighteen-level loss-amount-based sentence enhancement on appeal because he failed to present his current argument in objections to the district court at sentencing. This court "will generally not consider an argument not raised in the district court and presented for the first time on appeal." *United States v.*

*Ellison*, 462 F.3d 557, 560 (6th Cir. 2006)(citing *Foster v. Barilow*, 6 F.3d 405, 408 (6th Cir. 1993)). If appellate review is to be meaningful, it is absolutely essential that a defendant raise all objections to the sentence before his sentencing judge in the first instance. *United States v. Callin,* 83 F.App'x 776, 777 (6th Cir. Dec. 9, 2003)(internal quotation marks and citation omitted). In *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002), we held that where defendant explicitly agreed at sentencing that his prior convictions qualified as aggravated felonies, as reported in the PSR, he waived his claim on that issue. In *United States v. Nagi*, 947 F.2d 211, 213-14 (6th Cir. 1991), the defendants argued for the first time on appeal that the district court erred in not applying an earlier version of the Guidelines in calculating their base offense level. Defense counsel urged the court to impose a sentence within the ranges contained in the defendants' plea agreements, which were based on a later version of the Guidelines. *Id.* at 214. This court found that defendants had waived their arguments by failing to raise them in the lower court. *Id.* at 213-14. Similarly, in *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990), this court held that the defendant waived an issue concerning application of Guidelines where defense counsel not only failed to object to the application of the Guidelines, but affirmatively agreed with the court's decision to sentence under

17

the Guidelines. As this court noted, "An attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course." *Id.* at 214.

At the sentencing hearing in this case, defense counsel made no objection to the application of the eighteen-level enhancement to the base offense level. The district court asked defense counsel if he agreed with the calculations in the PSR, and he responded, "With the calculations themselves, yes." R. 328, ID 2646. The district court then stated, "The calculations are Criminal History Category I and total offense level 28, resulting in a range of 78 months to 97 months. That's what you're all agreeing to as being accurate?" R. 328, ID 2646. Defense counsel responded, "We agree on the range, Your Honor, yes." R. 328, ID 2646. At the conclusion of the proceedings, defense counsel stated that he had "[n]o additional objections." R. 328, ID 2666.

Defense counsel not only failed to object to the calculations in the PSR, he also affirmatively agreed with them. Because defense counsel failed to give the court "any inkling that [he] disagreed" with the district court's sentencing determination, *United States v. Barajas-Nunuez* 91 F.3d 826, 830 (6th Cir. 1996), the district court had no opportunity to examine the merits of the issue defendant now raises for the first time on appeal. Accordingly, we also find that Agbebiyi's failure to object to the

18

district court's loss amount calculation at sentencing amounted to a constructive waiver of his right to appeal this issue.

### B. Sixth Amendment Violation

Agbebiyi further argues that the loss-amount question should have been submitted to the jury instead of being decided by the judge. Agbebiyi argues that the Supreme Court's decision in *Apprendi v. United States*, 530 U.S. 466 (2000), and its subsequent decisions in *Alleyne v. United* States, ___ U.S. ___, 133 S.Ct. 2151 (2013), and *Southern Union Co. v. United States*, ___ U.S. ___, 132 S.Ct. 2344 (2012), stand for the proposition that he was entitled to a jury finding as to the loss amount because it was a factor that increased the length of his sentence and established the amount of his restitution obligation. Agbebiyi did not object below to the failure to submit the issue of the amount of loss to the jury during his trial. Thus, the plain-error test under Rule 52(b) as outlined in *United States v. Olano*, 507 U.S. 725, 733-34 (1993), applies. Under that test, before an appellate court can correct an error not raised in the trial court, there must be "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Johnson*

19

*v. United States*, 520 U.S. 461, 466-67 (1997)(internal quotation and citation omitted). Plain error review has been applied to an enhanced penalty argument under *Apprendi*. *See United States v. Cotton*, 535 U.S. 625, 631 (2002).

No error has been shown in this case. *Apprendi* and its progeny do not apply here, as those cases dealt with Sixth Amendment rights with regard to legally proscribed criminal penalties imposed by statutory minimums and maximums, while the sentence imposed here was based on the Sentencing Guidelines. Neither *Apprendi* nor *Alleyne* or *Southern Union* eliminated the general fact-finding discretion granted to the district courts under the advisory Sentencing Guidelines. *United States v. Osborne*, 545 F.3d 440, 445 (6th Cir. 2008)(citing *United States v. Booker*, 543 U.S. 220, 233 (2005)). The district court can find the facts, including the amount of loss, necessary to calculate the appropriate Guidelines range. *United States v. Keller*, 498 F.3d 316, 328 (6th Cir. 2007); *see also United States v. Gross*, 626 F.3d 289, 299 (6th Cir. 2010)(because the Guidelines range is only advisory, the district court was permitted to make factual findings concerning the amount of tax loss at sentencing). In *United States v. Smith*, 749 F.3d 465 (6th Cir. 2014), the defendants argued that the district court violated *Apprendi* and *Alleyne* when it based their Guidelines ranges on its own findings of the amount of loss

and number of victims rather than submitting those issues to a jury. This court noted that although *Alleyne* held that facts that increase mandatory minimum sentences must be submitted to a jury, "both *Apprendi* and *Alleyne* took care not to disturb the district court's discretionary fact-finding in other circumstances." *Smith*, 749 F.3d at 487. Where a defendant does not face a statutory maximum or statutory minimum sentence, *Apprendi* and *Alleyne* are inapplicable. *Id.* The statutory maximum for Agbebiyi's offenses was ten years imprisonment. 18 U.S.C. § 1347(a). Accordingly, the district court's imposition of a sixty-month sentence, well below that statutory maximum, does not give rise to any claim of error under *Apprendi* or *Alleyne*.

*Booker* also does not require a jury to determine restitution. *United States v. Johnson*, 440 F.3d 832, 849 (6th Cir. 2005); *United States v. Sosebee*, 419 F.3d 451, 461 (6th Cir. 2005). The statute governing restitution provides that the amount of restitution should be equal to the "amount of each victim's losses as determined by the court." 18 U.S.C. § 3664(f)(1)(A). Where a statute mandates the exercise of judicial discretion, "*Booker* provides no impediments to a judicial determination of the necessary underlying facts." *Sosebee*, 419 F.3d at 462. Restitution orders are also unaffected by the Supreme Court's ruling in *Apprendi*, which required that facts enhancing a sentence

21

above a statutory maximum penalty be found by the jury, "because the restitution statutes do not specify a statutory maximum." *United States v. Lay*, 612 F.3d 440, 448 (6th Cir. 2010).

Agbebiyi relies on *Southern Union*, in which the Supreme Court held that facts that increase the amount of a criminal fine beyond the statutory maximum must be found beyond a reasonable doubt. 132 S.Ct. at 2350. Agbebiyi argues that the Supreme Court's holding in *Southern Union* should logically extend to restitution. As several other circuits have noted after *Southern Union*, however, criminal fines are fundamentally different from restitution—fines are purely pecuniary measures proscribed by statute whereas restitution is intended to remedy victims of crimes' economic injuries. Accordingly, the holding in *Southern Union*, which dealt exclusively with criminal fines, does not apply. *See United States v. Green*, 722 F.3d 1146, 1150-51 (9th Cir. 2013); *United States v. Wolfe*, 701 F.3d 1206, 1216-17 (7th Cir. 2012); *United States v. Day*, 700 F.3d 713, 732 (4th Cir. 2012); *see also United States v. Jarjis*, 551 F.App'x 261, 261-62 (6th Cir. Jan. 24, 2014).

Agbebiyi had no Sixth Amendment right to have a jury decide the amount of loss used to calculate his Guidelines range and to establish his restitution obligation, and no plain error has been shown in this case.

C. Judgment of Acquittal on Conspiracy Charge

Agbebiyi argues that his conviction for conspiracy to commit health care fraud is not supported by sufficient evidence, and that he is entitled to a judgment of acquittal on that charge. Agbebiyi did not move for a judgment of acquittal during or after trial. The standard of review on appeal for an insufficient-evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)(emphasis in original). However, the failure to make a motion for judgment of acquittal under Fed. R. Crim. P. 29 constitutes a waiver of objections to the sufficiency of the evidence. *United States v. Jordan*, 544 F.3d 656, 670 (6th Cir. 2008). Where a defendant fails to make the requisite Rule 29 motions, review is "limited to determining whether there was a manifest miscarriage of justice. A miscarriage of justice exists only if the record is devoid of evidence pointing to guilt." *Id.* (quoting *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998)); *see also United States v. Kennedy*, 714 F.3d 951, 957 (6th Cir. 2013). Although Rule 29 now states that "a defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge[,]" *see*

Fed. R. Crim. P. 29(c)(3), Agbebiyi not only failed to move for a judgment of acquittal during trial, he also failed to so move after the return of the guilty verdict, as permitted under Fed. R. Crim. P. 29(c)(1). Therefore, the "manifest miscarriage of justice" standard applies in this case.

The offense of health care fraud under 18 U.S.C. § 1347 is committed by one who "knowingly and willfully executes, or attempts to execute, a scheme or artifice– (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program in connection with the delivery of or payment for health care benefits, items, or services[.]" § 1347. To establish a violation under § 1347, the government must prove beyond a reasonable doubt that the defendant "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009); *see also United States v. Semrau*, 693 F.3d 510, 525 (6th Cir. 2012). Proof of intent to defraud does not require direct evidence; a jury may consider circumstantial evidence and infer

intent from evidence of efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits. *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007).

The law also penalizes "[a]ny person who attempts or conspires to commit any offense under this chapter[.]" 18 U.S.C. § 1349. A conspiracy charge requires the government to prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy. *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008). The government is not required to show a formal written agreement. *Id.* "Instead, it is sufficient to demonstrate a tacit or mutual understanding among the parties." *Id.* Direct evidence of the conspiracy is not necessary; rather, "[i]t is enough to present '[c]ircumstantial evidence which a reasonable person could interpret as showing participation in a common plan....'" *Id.* (quoting *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000)).

The government need not prove that the defendant knew every detail of the conspiracy, but only that the defendant knew the object of the conspiracy and voluntarily associated himself with the conspiracy to further its objective. *Crossley*, 224 F.3d at 856. A defendant's participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances. *United States v. Salgado*, 250 F.3d

25

438, 447 (6th Cir. 2001). "Although an agreement must be shown beyond a reasonable doubt, the connection between the defendant and the conspiracy need only be slight, and the government is only required to prove that the defendant was a party to the general conspiratorial agreement." *Id.*

Agbebiyi argues that the government failed to prove that he knowingly and voluntarily became a participant in the conspiracy organized by Hernandez and her cohorts. He claims that he performed valid services for patients, and that he was unwittingly involved in the clinics' scheme as a pawn. Agbebiyi argues that he legitimately visited with patients, ordered tests and prescribed medications; that he was never told by the clinic owners that they intended to defraud Medicare; that he never ordered tests which his co-workers thought to be unnecessary; that he was not involved in the actual billing of Medicare; and that he received only reasonable compensation for his services.

The government's theory was that Agbebiyi participated in the conspiracy to defraud Medicare by ordering medically unnecessary tests. The government presented evidence that Agbebiyi worked at the clinics for a period spanning twenty months of the twenty-nine months during which the clinics were in operation. When Hernandez interviewed Agbebiyi, she explained what his role would be, namely, to see patients and then to refer them for diagnostic tests.

26

Agbebiyi never expressed any concerns about ordering the tests or the fact that the tests would be sent elsewhere for interpretation.

Agbebiyi was originally paid a salary of $100 per hour. However, when Hernandez opened the Manuel Clinic, Agbebiyi told her he wanted an additional fifteen percent of the total billed by the three clinics. Although Agbebiyi did not process the Medicare claims at the clinics, he signed a certificate which put him on notice of Medicare rules which rendered him responsible for claims submitted under his provider number. Because the clinics were required to have a doctor on site in order to bill Medicare, it was Agbebiyi's signature on the test orders which allowed the clinics to submit the claims. *See Hunt*, 521 F.3d at 648 (noting that because the health care benefit programs would not have paid for the procedures but for the doctor's signature on the orders, the doctor was the direct and proximate cause of the harm suffered by those entities).

Dr. Teener testified that as a neurologist specializing in nerve problems, he only referred one-half to two-thirds of his patients for nerve conduction studies, and that the unreliable Doppler test was used only in rare circumstances. The nerve conduction and transcranial Doppler tests are used by neurologists and physiatrists specializing in rehabilitative medicine. The nerve conduction study is given in conjunction with a painful

27

needle electromyography test. Teener is also typically present when the test is being given so that he can monitor the test and explain the results to the patient immediately after the test. Dr. Acosta, a general practitioner like Agbebiyi, testified that he always referred patients to a specialist for tests such as the nerve conduction study.

In contrast, Agbebiyi, a general practitioner, ordered the nerve conduction study for ninety-three percent of his patients. All but one of the 537 patients seen by Agbebiyi were referred either for a nerve conduction study or a transcranial Doppler test. There is no evidence that Agbebiyi ever referred anyone for the painful needle electromyography test. He was occasionally absent from the building when the tests were administered; Agbebiyi informed Oliver that the tests could be given before he arrived for the afternoon.

Teener's technicians typically trained for nine to ten months before they were permitted to give a nerve conduction test independently. Oliver, who had no medical training other than a phlebotomy class, received ten to twelve hours of training from Juan and Santiago Villa, who also had no medical training, on how to operate the clinics' equipment. There is no evidence that Agbebiyi ever expressed any concern about the fact that Oliver, who interviewed patients, took their vital signs, and administered

28

tests, had no medical training in these areas. Dr. Acosta, who only worked at the clinics a few months, was quickly troubled by the fact that Hernandez and other clinic employees pressured him to order tests. In contrast, Agbebiyi readily ordered the tests suggested by Oliver, Juan Villa, and Hernandez.

Teener also testified concerning a sample of patient records he reviewed, where the test results for the nerve conduction studies were physiologically impossible, indicating that the test procedures were invalid. He stated that even a family practice doctor who received these results would be worried and request additional testing. Agbebiyi was given the patient files to review after test results came in, yet he never expressed concern about the practice of sending the test results to Florida for interpretation. Agbebiyi directed Hee to give ultrasound tests to patients whose test results from previous ultrasounds had not yet come back. Agbebiyi also ordered her to perform ultrasounds on patients who objected to taking the tests.

Agbebiyi contends that there is no evidence that he knew that patients were being paid to come to the clinics. However, there is evidence that Agbebiyi knew that food was being provided for the patients, as he was present when Juan Villa delivered the food and would eat some of the food himself. After he had seen the patients, Agbebiyi gave a list of ordered tests and any

29

prescriptions to Oliver, rather than giving the prescriptions to the patients after he visited them, because if the patients received the prescriptions directly, they would leave without taking the tests. Madden, a patient who received eighteen nerve conduction studies at Alpha & Omega, testified that she went to the clinic not because she was sick, but because she received food and prescriptions. When she objected to taking the tests, Agbebiyi told here that it was part of her treatment, although he and other people at the clinic never called her to talk about her test results. Isaac Carr, one of the drivers for the clinics, testified that Agbebiyi stated on one occasion that he wanted to get out once he found out what they were doing at the clinics, yet Agbebiyi worked at the clinics over a twenty-month period.

Based on the government's evidence, a rational trier of fact could come to the conclusion that Agbebiyi tacitly agreed to the scheme to defraud Medicare, and committed overt acts in furtherance of the scheme by ordering tests which were not medically necessary. This is not a case in which there was no evidence of guilt of Agbebiyi's knowing and voluntary participation in the conspiracy. Agbebiyi has failed to show grounds for setting aside his conspiracy conviction.

## III. Conclusion

In accordance with the f§oregoing, the judgment and sentence of the district court are AFFIRMED.