RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0224p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 14-5720

KEITH CHURN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:10-cr-00116—William J. Haynes, Jr., Chief District Judge.

Argued: August 4, 2015

Decided and Filed: September 10, 2015

Before: COLE, Chief Judge; GIBBONS and STRANCH, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Andrew Guy, Kevin Potter, FEDERAL APPELLATE LITIGATION CLINIC, Ann Arbor, Michigan, for Appellant. David M. Lieberman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Andrew Guy, Kevin Potter, FEDERAL APPELLATE LITIGATION CLINIC, Ann Arbor, Michigan, Melissa M. Salinas, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Toledo, Ohio, Dennis G. Terez, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. David M. Lieberman, Sandra G. Moses, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

### OPINION

_____

COLE, Chief Judge. In December 2013, defendant Keith Churn was found guilty of seven counts of bank fraud stemming from two schemes in which he received bank loans

ostensibly to construct houses, but performed little to no work. The district court sentenced him to 33 months in prison and ordered restitution of $237,950.50. On appeal, Churn argues his conviction should be reversed and that he should receive a new trial because the district court purportedly made various evidentiary errors. He also requests vacatur of a portion of his restitution order, claiming the amount exceeds a statutory maximum, and vacatur of his sentence. Because the district court did not commit any reversible evidentiary errors, entered an appropriate restitution order, and properly sentenced Churn, we affirm the judgment of the district court.

## I. BACKGROUND

### A. Churn Proposes Two Projects.

Defendant Keith Churn owned C&M Construction Management, a Tennessee construction company specializing in remodeling and rehabilitation, since the late 1990s. Around October 2006, Churn entered a business agreement with Dustin Rief, under which Rief would purchase real property at 2408 Clarksville Pike, Nashville, Tennessee, and Churn would install a modular—or prefabricated—house on the property. Churn would pay Rief rent during the six-to-eight months of construction and would purchase the property from him upon completion. For his efforts, Rief would receive $5,000 initially and an additional $5,000 after Churn's purchase, for a total of $10,000.

Rief financed the purchase and construction of the Clarksville Pike property with a $187,800 construction loan from BancorpSouth Bank ("BSB"). Under the terms of the loan agreement, a portion of the loan would be distributed upfront to purchase the property, and the remaining funds would be distributed in stages to pay for construction. BSB disbursed $66,758.19 for the purchase, leaving $121,041.81 for construction.

The same year, Churn proposed a similar investment to Milton Thomas. Thomas agreed to obtain financing to purchase 956 Green Street, Franklin, Tennessee, and Churn agreed to demolish the existing house and install a modular home. The two would split any profits. To finance the project, Thomas received a $226,500 loan from BSB, $77,976.83 of which was distributed to fund the property purchase.

BSB distributed the portion of the loan for construction in "draws." For each draw, the bank would transfer money from the loan to Rief's and Thomas's checking accounts, which they could then use to pay contractors. Before approving a draw, the bank might send an inspector to the property, or it might review contractors' receipts, to ensure that the claimed work was actually being performed.

There were four draws made for the Clarksville Pike property: $25,000 on October 31, 2006; $15,000 on December 18, 2006; $30,000 on January 10, 2007, and $4,500 on January 12, 2007. On December 5, 2006, Churn submitted an invoice for $17,733 to BSB for permit fees, disconnecting old utilities, grading, and preparing footings and foundations. Based on the invoice, BSB approved a $15,000 draw on December 18.

On December 22, 2006, Churn submitted a specification sheet and an invoice to BSB, which purportedly showed an order for a modular house from All American Homes of N.C., LLC ("AAH"). The invoice charged a down payment of $33,462, or approximately one-third of the total cost of the modular house. Two weeks later, Churn informed a BSB loan officer, Lisa Campsey, that the house would be set on February 8, 2007. Campsey later approved draws of $30,000 and $4,500. During this period, a site inspector for BSB submitted periodic reports to BSB indicating that demolition of the existing structure had occurred and the lot was cleared.

There were four draws on the loan for the Green Street property: $20,000 on December 15, 2006; $8,000 on January 10, 2007; $12,000 on January 18, 2007; $22,000 on January 23, 2007; and $668.91 on February 1, 2007. On January 17, 2007, Churn submitted a specification sheet and an invoice to BSB, which purportedly showed an order for a modular house from AAH. Like the invoice for the Clarksville Pike property, the invoice charged a down payment of approximately one-third of the total cost of the modular house, or $33,638. Based on the invoice, BSB approved draws of $12,000 and $22,000.

**B.     Questions Arise About the Projects.**

At some point, Campsey grew suspicious about the progress of the projects. For the Clarksville Pike property, although some demolition had been done, Campsey learned that the tasks listed on the December 5, 2006, invoice were not actually completed, including "pulling"

the construction permit. Nor was the modular house set on February 8 as Churn said it would be. Similarly, she visited the Green Street property, but found no completed work.

An inspector dispatched by BSB made similar observations. On his first visit to the Clarksville Pike property in October 2006, he noted that the existing structure had been torn down and cleared. But a few months later, on March 23, 2007, the inspector estimated that only 1.2 percent of the construction project had been completed. He later found that no additional work was performed from then through July 17. The inspector also assessed the Green Street property on March 16 and determined that only 1.2 percent of the construction project had been completed; when he returned on July 17, he found that no work had been done since his March 16 visit.

Questions about Churn's invoices arose as well. The invoices he submitted to BSB to support draw requests purportedly reflected purchases for two "Hot Tamale"-style modular houses. But AAH never received any orders or payments from Churn. AAH also did not prepare the invoices Churn submitted to BSB. While the submitted invoices reflected a one-third deposit on the total purchases, as well as costs associated with installing electrical and plumbing "tie-ins," AAH never required more than a 10-percent deposit—the industry standard. Indeed, AAH was not even able or licensed to provide electrical or plumbing services.

On March 3, 2007, Campsey emailed Churn, stating that an AAH representative told her that it had not received funds from Churn and would not start construction on modular homes until it received the money. She stated that Churn's representations to BSB that he had paid deposits on the houses using the loans "greatly conflicts" with information given by AAH. Since Churn had previously said that he would pay for the purchases through checks, Campsey requested copies of cancelled checks and further information about what charges Churn had paid, but she never received any. She also pointed out to Churn that there was no pad (a part of the foundation) laid on the Green Street property even though Churn told her that it was already installed.

Two days later, Churn told Campsey that she would "have the information that's needed by the end of the business day." Churn also said that BSB's inspector should "go by [the] site at [the] end of this week" and that Churn "will also have in writing this week [a] guarantee from

[the] manuf[acturer] that we will have product this month on the sites." (*Id.*) Campsey replied by confirming an inspection date, requesting proof of payment, and asking for a written guarantee from the manufacturer. She never received any of the items. When Campsey later went to the Green Street property, she observed that "nothing had been done since the first time. It was the same every single time . . . ." (Trial Tr., R. 80, PageID 296.)

Campsey later called Churn. He said that the houses were coming, but from IBC instead, a different manufacturer. Churn promised to perform additional work on the properties, but Campsey said that she no longer trusted him.

On March 8, 2007, Churn told Campsey that he "will be moving forward with the work on the projects" and that she was "very wrong about [her] comments." Churn said that he would provide "[a]ll info" to Rief and Thomas, who would "deal with [her] directly." (*Id.*) Campsey, who had been in contact with Rief and Thomas throughout the projects, still never received any documentation.

In early May 2007, BSB sent formal demand letters to Rief and Thomas, requesting written confirmation that modular houses were being completed and verification of the delivery dates. The letters warned that failure to provide the requested documentation or to complete the site and foundation work by May 18, 2007, would result in the loans being payable immediately.

On May 18, Churn sent an email with two attachments to BSB. The first attachment was an invoice from "C&M Construction Managment" [sic] to Rief, stating that the "deposite [sic] has been paid for unit ordered for 2408 [Clarksville Pike] job site," and confirming a $33,463 payment. The second attachment was a photo of modular houses sitting on trailers. Churn told Campsey that the structures depicted would be delivered to the Clarksville Pike property.

Campsey quickly responded that "this information is not sufficient." She again demanded written confirmation from AAH verifying production of the units and the dates of delivery, site preparation, and foundation work.

Churn responded five days later, on May 23, stating that the units were not from AAH, but that BSB would be getting paperwork from C&M Construction Management directly. BSB never received any paperwork. During its investigation, BSB located the modular houses shown

in the photographs. After examining the houses' serial numbers, the bank learned that they were owned by other people, not Churn.

Churn stopped making monthly payments on the loans sometime in April 2007. While Rief attempted to make some payments himself, he was ultimately unable to continue paying, leading to the foreclosure of the Clarksville Pike property and Rief's filing for personal bankruptcy. Thomas also attempted to make some payments himself, but was unable to do so after he lost his job; BSB foreclosed the Green Street property and Thomas also filed for personal bankruptcy.

## C. Churn's Explanation.

Churn had a different understanding of events. According to him, he did place orders with AAH, but sometime in mid-February to mid-March, it placed his orders on hold "because of a lot of confusion that they said they were having from the bank." (Trial Tr., R. 82, PageID 629–30.) Churn attempted to contact other manufacturers to provide him with modular houses, but was unable to locate any that would sell him units at a comparable cost. Later, he found some modular houses at a defunct AAH plant; the houses were initially purchased by a nonprofit that eventually had no use for them after a failed land deal. These, Churn claims, were the units in the photograph he sent to BSB: Churn speculates that the bank was confused because the units were associated with what were likely the names of the original buyers and not his.

Churn placed these newfound units "under contract" and met with Chris Marketti of BSB to discuss a deal. (Trial Tr., R. 82, PageID 632.) Churn purportedly detailed a breakdown of expenses for the Clarksville Pike property and tried to negotiate with BSB to pay him, but only after delivery of the unit. BSB, however, "never followed up." (Trial Tr., R. 82, PageID 667.) Had the bank not ceased working with him, Churn believed that he could have completed the deals.

## D. Churn Is Indicted.

On May 5, 2010, a grand jury indicted Churn on thirteen counts of bank fraud under 18 U.S.C. § 1344, each count corresponding to a particular bank draw. The Clarksville Pike property is the subject of Counts 1, 2, 3, 7, 8, 9, and 13 in the indictment; the Green Street

property is the subject of Counts 4, 5, 6, 10, 11, and 12 in the indictment. The government voluntarily dismissed Counts 1 and 4. The jury convicted Churn on Counts 3, 7, 8, 9, 10, 11, and 12, and acquitted him of the remaining four counts. The district court sentenced him to 33 months in prison and five years of supervised release, and ordered restitution of $237,950.50. Churn appeals, arguing that he is entitled to a new trial, vacatur of his sentence, or vacatur of a portion of the restitution order.

## II. DISCUSSION

### A. Standard of Review for Evidentiary Rulings.

Churn argues that the district court made several erroneous evidentiary rulings. "Generally, a district court's evidentiary rulings are reviewed for abuse of discretion." *United States v. Chalmers*, 554 F. App'x 440, 449 (6th Cir. 2014). If evidence was erroneously admitted, we ask whether the admission was harmless error or requires reversal of a conviction. *United States v. Martinez*, 588 F.3d 301, 312 (6th Cir. 2009).

### B. Whether an Email About an Order Status Contained Inadmissible Hearsay.

Churn claims that the district court committed reversible error by admitting impermissible hearsay in a printed email. During Campsey's testimony, the government introduced a March 3, 2007, email from her to Churn stating that she had spoken with an AAH representative named "Bob." The email stated that Bob "was not familiar with IBC or a house coming out of Indiana." (*Id.*) The email also reflected that Bob said that "the money needed from [Churn] to start production of the homes was being wired by [Churn] to [AAH's] corporate office yesterday. . . . [I]f the wire was received by Monday it would take approximately 4 weeks to get the materials then an additional 2 weeks to complete the structure." (*Id.*) Campsey's email stated that the information provided by Churn "greatly conflicts with the information given . . . by Bob." (*Id.*) So she asked Churn to submit copies of the wire transfer and the confirmation number, to notify her when he had installed a pad and block (a part of the foundation) at the Green Street property, and to set up a meeting to "straighten out all the confusion." (*Id.*)

Churn's counsel objected that the "statements from Bob" in the email constituted inadmissible hearsay.  (Trial Tr., R. 80, PageID 282.)  The government responded that it was "not admitting [the email] for the truth of what Bob said, but for [Campsey's] state of mind and her concern over whether or not she was receiving accurate information," leading her to "question these other documents."  (*Id.* at 282–83.)  The district court overruled the objection, stating that the email illuminated Campsey's "understanding, her state of mind, and her reaction to it."  (*Id.* at 283.)  The court then instructed the jury that the email was "being admitted for a limited purpose.  Not that what the other person actually said is true or not, but to explain the basis of [Campsey's] state of mind, to explain what [she] was doing."  (*Id.*)

On appeal, Churn argues that the district court erred in two ways.  First, he claims that it wrongly admitted the evidence to show Campsey's state of mind because the state-of-mind exception under Federal Rule of Evidence 803(3) requires that the statement explain the declarant's, i.e., Bob's, state of mind, not Campsey's.  Second, Churn claims that the district court wrongly admitted the evidence to show the basis of Campsey's undeclared mental state rather than the declarant's actual mental state.  *See Daniels v. Lafler*, 192 F. App'x 408, 424 (6th Cir. 2006) ("Federal Rule of Evidence 803(3) does allow the admission of statements as to the declarant's state of mind, but does not allow the admission of statements as to *why* the declarant has said state of mind.").

The government responds that the district court appropriately admitted the statements to demonstrate their effect on Campsey.  The statements, it says, are not being offered to prove the truth of the matters asserted.  *See United States v. Boyd*, 640 F.3d 657, 664 (6th Cir. 2011) ("Statements offered to prove the listener's knowledge are not hearsay.").  Rather, the government claims it was trying to show that while Campsey "readily approved disbursements of loan money [early on] based on invoices and representations from Churn," she quickly grew suspicious of Churn and demanded verification of his work.  The statements in the email were not introduced to prove the truth of Bob's statement, the government contends, but rather to explain Campsey's conversation and why BSB demanded records, assurances, and meetings from Churn.  The reasons for BSB's actions, in turn, serve to rebut Churn's allegation that BSB obstructed his dealings with AAH and hindered him from completing his projects.  Because

Bob's statements are not hearsay, the government argues, they need no exception to be admitted, and the state-of-mind exception under Rule 803(3) is irrelevant.

"A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009). Such a statement may be admitted to show why the listener acted as she did. *See United States v. Pugh*, 273 F. App'x 449, 456 (6th Cir. 2008). If a statement is hearsay, it is inadmissible unless some exception applies. Fed. R. Evid. 802. Federal Rule of Evidence 803(3) provides an exception to the bar against hearsay for "[a] statement of [a] declarant's then-existing state of mind (such as motive, intent, or plan) . . . but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3).

The district court did not abuse its discretion in admitting the email because the statements therein are not hearsay. Whether Bob's statements were true or not was irrelevant to what the government was trying to show by introducing the email. As the government explained to the district court, it was "not admitting that [email] for the truth of what Bob said, but for [Campsey's] state of mind and her concern over whether or not she was receiving accurate information." (Trial Tr., R. 80, PageID 282.) It did not matter whether Bob "was [] familiar with IBC or a house coming out of Indiana," whether "the money needed from [Churn] to start production of the homes was being wired by [Churn] to [AAH's] corporate office yesterday," or whether "if the wire was received by Monday it would take approximately 4 weeks to get the materials then an additional 2 weeks to complete the structure." A review of the trial transcript supports the government's assertion that it was simply trying to illustrate why Campsey became suspicious and demanded verification from Churn about his work.

While the district court initially called the statements "hearsay," it later clarified that the statements were "[n]ot [being admitted to show that] what the other person actually said is true or not, but to explain the basis of this witness's state of mind, to explain what this witness was doing." (Trial Tr., R. 80, PageID 283.) The district court thus prudently instructed the jury that the document was "being introduced for a limited purpose." (*Id.*) Accordingly, "because the government did not offer the statements for their truth, the statements fall outside of the definition of hearsay." *United States v. Talley*, 164 F.3d 989, 999 (6th Cir. 1999). And because

the email's statements were only admitted to "show its effect on the listener," *Biegas*, 573 F.3d at 379, the government did not need to rely on the state-of-mind exception.

**C.    Whether Campsey's Statement Concerning a County Permit Contained Inadmissible Hearsay.**

Churn claims that the district court committed plain error by admitting impermissible hearsay about whether Churn secured a county permit.  During Campsey's testimony, the government presented Churn's first invoice submitted to BSB, which listed expenses for building permit fees, disconnecting utilities, and certain construction work.  BSB approved a $15,000 draw based on that invoice.  The following exchange occurred:

> [The government]:  What work that is indicated on this invoice was actually done?
>
> [Campsey]:  Through talking to the county,--
>
> [Defense counsel]:  Your Honor, I'm going to object to hearsay.
>
> The Court:  Restate your question.
>
> [The government]:  I will, Your Honor.  Do you know personally what work was done, based on your own observations?
>
> . . .
>
> [Campsey]:  My own observation, none of this work was ever completed.  And through verification with the county, the permit was never pulled.

(Trial Tr., R. 80, PageID 270.)  Churn's counsel did not object at trial to Campsey's question.

Churn now argues that the government introduced Campsey's statement that "through verification with the county, the permit was never pulled" to support the proposition that Churn never used the disbursed money to secure the permit and pay fees.  He asserts that the statement was hearsay since no one from the county testified and no exception to the hearsay rule applied.  Churn maintains that the remaining evidence could not support his convictions on Counts 3 and 7.  He points out that while Campsey testified that "none of this work was ever completed," she later conceded that the house was demolished and the pad cleared.  (Trial Tr., R. 80, PageID 270–71; *see also id.* at 215.)  Because this statement was the only evidence that he failed to spend the disbursed money on building permits, Churn contends that its erroneous admission directly affected his convictions on Counts 3 and 7 and thus prejudiced him.  In addition, Churn

argues that "the county's statements . . . severely damaged Mr. Churn's credibility for the rest of trial."

Campsey's statement called for hearsay. The content of the county records would fall within an exception to the hearsay rule only if properly authenticated under Federal Rules of Evidence 803(6). The outcome does not depend on whether Campsey learned about the permit "[t]hrough talking to the county," as she said, or whether she herself had checked the records.

Nonetheless, Churn fails to demonstrate that the error affected his substantial rights. *See United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). Campsey's uncontroverted testimony, based on her personal observations, was that none of the work that appeared on the invoice was ever completed. (*See* Trial Tr., R. 80, Page ID 268–71.) And the bank relied on the invoice as a whole—not just the reference to the permit—in distributing the draw in December 2006. (*Id.* at 271.) Thus, although the statement was clearly hearsay, Churn is not entitled to relief.

**D.**     **Whether the District Court Properly Admitted Evidence of Another Transaction as *Res Gestae*.**

Churn argues that the district court abused its discretion and prejudiced him by admitting testimony about a real-estate deal that did not underlie his charged offenses. During Rief's testimony, the government asked him whether Clarksville Pike was the only property in which he invested with Churn. When Rief responded "[n]o" and identified another investment in 1712 North 24th Avenue, Churn's counsel requested a sidebar. (Trial Tr., R. 81, PageID 404.)

Churn's counsel informed the district court that the government's trial brief stated that the government intended to introduce evidence concerning the North 24th Avenue transaction and that the government suggested it could do so under the *res gestae* exception for background information related to the government's allegations or Federal Rule of Evidence 404(b)'s exceptions to the rule's general prohibition against introducing evidence of other crimes or acts to prove character. He objected, however, stating that the exceptions did not apply and that the prejudice from the evidence would outweigh any probative value it had. The government responded that the deal at issue "occurred at the same time," was "part of the same series of events," and happened in the same manner as the Clarksville Pike and Green Street transactions,

and thus testimony about it was admissible, though the government also said that it did not intend to introduce any documentary evidence. (*Id.* at 404–05.) The district court overruled Churn's objection and held that the testimony was "intrinsic evidence" because "it explains the relationship between the witness and the defendant and the nature of their business relationship and the course of their business dealings." (*Id.* at 405–06.) It did not address whether the testimony was admissible under Rule 404(b).

Rief then testified about his agreement with Churn concerning the Clarksville Pike property, and stated that although the North 24th Avenue transaction "was a rehab, [] the deal was set up the same." (*Id.* at 406.) For both projects, Rief was responsible for obtaining financing and Churn was responsible for the construction. Like Clarksville Pike, Rief testified that "nothing happened with the property"—not only was the rehab never completed, "[i]t was never started." (*Id.* at 433.) Similarly, it was foreclosed. The government offered no more testimony about the North 24th Avenue transaction.

On appeal, Churn argues that the district court abused its discretion by ruling that the North 24th Avenue transaction was "intrinsic evidence" and thus admissible as *res gestae*. He contends that the North 24th Avenue transaction cannot fit in this court's definition of intrinsic evidence, which "requires a connection to the charged offense," *United States v. Adams*, 722 F.3d 788, 822 (6th Cir. 2013), one involving a "close temporal, spatial, and causal proximity" between the prior act and charged offense, *Chalmers*, 554 F. App'x at 451. Here, Churn says, the North 24th Avenue transaction was "merely background explanation" of Churn and Rief's *relationship*, and does not have any "direct connection" with the Clarksville Pike *deal*, notably because a different financial institution was involved. Churn also asserts that the prejudice from admitting testimony about the North 24th Avenue transaction outweighs its probative value because providing a "better understanding" of Churn and Rief's relationship does not justify the possibility of the jury believing that Churn caused the foreclosure in the North 24th Avenue transaction.

The government responds that because "Churn executed a scheme to defraud banks by inducing individuals to obtain construction loans and the banks to disburse those loans," the North 24th Avenue transaction "falls into this scheme." Since "this transaction evidences 'the

very scheme alleged in the indictment,'" the government argues, it is "intrinsic" to that scheme and the district court correctly admitted the testimony. *Id.* at 37 (quoting *United States v. Weinstock*, 153 F.3d 272, 277 (6th Cir. 1998)). In addition, the government claims that Churn never raised an objection based on Rule 403 and therefore has waived this argument on appeal. Finally, the government contends that any error in admitting the testimony is harmless because of the overwhelming evidence of fraud from the two charged offenses.

This court "ha[s] recognized the admissibility of *res gestae*, or background evidence, in limited circumstances when the evidence includes conduct that is 'inextricably intertwined' with the charged offense." *United States v. Clay*, 667 F.3d 689, 697 (6th Cir. 2012). "Proper background evidence has a causal, temporal or spatial connection with the charged offense." *Hardy*, 228 F.3d at 748. "[Such] evidence may include evidence that is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of the witness's testimony, or completes the story of the charged offense." *United States v. Grooms*, 566 F. App'x 485, 491 (6th Cir. 2014) (internal quotation marks omitted).

*Res gestae* is sometimes also known as "intrinsic evidence." "Intrinsic acts are those that are inextricably intertwined with the criminal act charged or a part of the criminal activity as opposed to extrinsic acts, which are those that occurred at different times and under different circumstances from the offense charged." *United States v. Stafford*, No. 98-1187, 1999 WL 1111519, at *4 (6th Cir. Nov. 24, 1999). We have "acknowledge[d] that the distinctions among *res gestae*, inextricably intertwined evidence, intrinsic evidence, and background evidence [are] far from clear." *Adams*, 722 F.3d at 822 n.26. But we often treat the various concepts similarly. *See id.*

*Res gestae* evidence does not implicate Federal Rule of Evidence 404(b), which generally bars evidence of past acts to prove character, but with some exceptions. *Hardy*, 228 F.3d at 748. Notably, this court "allow[s] the trial court to admit evidence regarding a defendant's *unindicted* criminal activity when that activity is 'intrinsic' or 'inextricably intertwined' with charges named in the indictment." *United States v. Potts*, No. 97-6000, 1999 WL 96756, at *9 (6th Cir. Feb. 2, 1999) (emphasis added). Even if evidence is *res gestae*, we "must also find that the district court

did not abuse its discretion in concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice pursuant to Federal Rule of Evidence 403." *United States v. Joseph*, 270 F. App'x 399, 406 (6th Cir. 2008) (per curiam).

Rief's testimony about the North 24th Avenue transaction was *res gestae* because it was "closely related in both time and nature to the crime charged." *United States v. Vincent*, 681 F.2d 462, 465 (6th Cir. 1982) (internal quotation marks omitted). As Rief stated at trial, "the deal was set up the same" as the Clarksville Pike transaction. (Trial Tr., R. 81, PageID 406.) The district court correctly found that the testimony "explains the relationship between the witness and the defendant and the nature of their business relationship and the course of their business dealings." (*Id.* at 405–06.) And as the government proffered, Churn persuaded Rief to invest in both that transaction and the Clarksville Pike transaction around the same time. While Churn attempts to distinguish the two transactions by pointing out that the North 24th Avenue transaction did not involve a loan from a bank, that distinction is immaterial; we only require that the facts are "closely related," not identical. *See Vincent*, 681 F.2d at 465. That Churn was not indicted for the North 24th Avenue transaction is also irrelevant because we have held that even unindicted activity can be "inextricably intertwined" with the actual charges. *Potts*, 1999 WL 96756, at *9.

In ruling that the evidence was admissible, the district court correctly concluded that the probative value of the evidence was not outweighed by unfair prejudice. Because the court did not abuse its discretion in admitting the *res gestae* evidence, reversal is unwarranted.

### E.      Whether the Cumulative Weight of Evidentiary Errors Warrant Reversal.

Churn argues that the cumulative weight of the district court's erroneous evidentiary rulings prejudiced him and thus reversal is warranted. "Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983). Although the court erred in admitting Campsey's testimony about verifying county permit records, that error was harmless and thus did not affect his substantial rights. Accordingly, there is no basis for reversal based on cumulative error.

**F.      Whether the District Court Imposed an Erroneous Sentence.**

Churn argues that the district court improperly based its sentence on conduct underlying charges for which he was acquitted.  "This court reviews a constitutional challenge to a defendant's sentence *de novo* wherever the defendant preserves the claim for appellate review." *United States v. Copeland*, 321 F.3d 582, 601 (6th Cir. 2003).

Churn argues that this court should reverse his prison sentence and remand for resentencing because the district court used dismissed and acquitted conduct to increase his prison sentence to an "unreasonable" level.  Nonetheless, Churn acknowledges that this court "currently allows district courts to consider dismissed and acquitted conduct when imposing sentences below the statutory maximum."  Indeed, the Supreme Court of the United States, as well as an en banc panel of this court, has held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam); *United States v. White*, 551 F.3d 381, 383 (6th Cir. 2008) (en banc).  Churn does not argue that the conduct underlying the acquitted charges was not proven by a preponderance of the evidence.  Because the district court correctly applied existing law in determining Churn's sentence, we affirm the sentence imposed by the district court.

**G.      Whether the District Court Imposed an Erroneous Restitution Order.**

Churn argues that the district court violated his right to a jury trial under the Sixth Amendment of the United States Constitution by using facts it found on its own to increase the restitution amount imposed upon him beyond the maximum allowed under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A.  In his sentencing memorandum, Churn argued that "restitution should only apply to the counts of conviction," and thus he should only be ordered to pay $97,600. (Sentencing Mem., R. 89, PageID 771.)  At the sentencing hearing, Churn's counsel objected to the district court's reliance on the four acquitted and two dismissed counts to augment the calculated loss for which restitution was ordered.  The district court overruled the objection and ordered restitution of $237,950.50, or $140,350.50 more than the amount of harm linked to his convicted counts.

On appeal, Churn argues that because restitution is a criminal punishment, and any fact that increases punishment beyond a statutory maximum must be found by a jury under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the district court unconstitutionally enhanced his restitution under the MVRA based on judicial factfinding. He also claims that the Supreme Court's decision in *Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012), confirms his position that restitution orders must be based on facts found by a jury.

The government rejects Churn's premise that the MVRA has a statutory maximum and therefore maintains that *Apprendi* does not apply to the statute. Thus, the government distinguishes *Southern Union*, which involved a punishment scheme with a statutory maximum fine, from this case. Even assuming that the MVRA has a statutory maximum, the government argues that because the statute also has an exception for criminal conduct involving a scheme, conspiracy, or pattern of criminal activity, and Churn was convicted of "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice" to defraud a bank, 18 U.S.C. § 1344, the district court correctly ordered restitution based on Churn's entire scheme, which included conduct underlying the dismissed and acquitted counts.

"This court reviews a constitutional challenge to a defendant's sentence *de novo* wherever the defendant preserves the claim for appellate review." *Copeland*, 321 F.3d at 601.

Under the MVRA, a district court "shall order" a defendant to make restitution to "an identifiable victim or victims [who] has suffered a [] pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1)(B). "Victim" is defined as:

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).

The Supreme Court of the United States has held that, other than the existence of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*,

530 U.S. at 490. However, we have noted that "[a]n intra-circuit split exists [in the Sixth Circuit] on the question of whether the MVRA specifies a statutory maximum." *United States v. Winans*, 748 F.3d 268, 272 n.2 (6th Cir. 2014). In *United States v. Sosebee*, this court observed that "we have [] held that restitution orders are not affected by the Supreme Court's ruling in *Apprendi v. New Jersey . . .* because the restitution statutes do not specify a statutory maximum." 419 F.3d 451, 461 (6th Cir. 2005). We also pointed out that the Third, Seventh, Eighth, and Tenth Circuits have held that *Apprendi* does not apply to restitution orders under the MVRA. *Id.*

Six years later, however, this court stated in *United States v. Freeman* that "the restitution statute [MVRA] '*does* set a statutory maximum on the amount of restitution.'" 640 F.3d 180, 193 (6th Cir. 2011) (quoting *United States v. Gordon*, 480 F.3d 1205, 1210 (10th Cir. 2007) (original emphasis)). That maximum, we said, is "the amount causally linked to the offense of conviction." *Id.* (internal quotation marks omitted). In making this determination, we did not address *Sosebee*'s contrary statement.

Here, even if the MVRA prescribes a statutory maximum, the district court did not exceed it. Churn was convicted of "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice to defraud a financial institution" when he was convicted of bank fraud. 18 U.S.C. § 1344(1). Because each count of the indictment corresponded to a particular draw related to the Clarksville Pike or Green Street properties, the district court did not impose a restitution amount greater than the amount of harm directly caused by Churn's "criminal conduct in the course of the scheme, conspiracy, or pattern [of criminal activity]." 18 U.S.C. § 3663A(a)(2). Therefore, the order did not go beyond any maximum specified in the MVRA and did not violate *Apprendi*, even if *Apprendi* applies to the MVRA.

As Churn acknowledges, however, we have already squarely held that "restitution orders are not affected by the Supreme Court's ruling in *Apprendi v. New Jersey . . .* because the restitution statutes do not specify a statutory maximum." *Sosebee*, 419 F.3d at 461. We adhere to that principle now. As a published decision, *Sosebee* is controlling authority for all subsequent panels of this court absent a reversal by the Supreme Court or an en banc panel of this court, and *Freeman*'s statement does not alter our conclusion to the extent it conflicts with *Sosebee*. *See Darrah v. City of Oak Park*, 255 F.3d 301, 309–10 (6th Cir. 2001). Accordingly,

*Apprendi* does not apply to the MVRA and the district court's restitution calculation need not be limited only to Churn's convicted offenses.

Contrary to Churn's argument, *Southern Union* does not cast doubt on the conclusion we reach—if anything, it reinforces our decision. *Southern Union* involved a gas company that was charged with violating the Resource Conservation and Recovery Act, which provides for a maximum criminal fine of $50,000 per day of violation. 132 S. Ct. at 2349. Although the indictment accused the company of violating the statute for 762 days, the court instructed the jury that it could convict based on one day's violation, which the jury did. *Id.* The court set a maximum potential fine of $38.1 million, i.e., $50,000 multiplied by 762 days. *Id.* The defendant appealed, arguing that any fact resulting in a fine over the statutory daily maximum had to be found by a jury. *Id.* The Supreme Court agreed. *Id.* at 2357. But the statute in *Southern Union* had a defined statutory daily maximum. The MVRA does not. Thus, *Southern Union* does not apply here.

The weight of authority supports our conclusion. At least four cases from this court have followed *Sosebee* in the wake of *Freeman* and *Southern Union*, holding that judge-found facts can be used to calculate restitution under the MVRA and that *Southern Union* does not dictate otherwise, whereas there appears to be no case to the contrary. *United States v. Johnson*, 583 F. App'x 503, 510 (6th Cir. 2014) (reaffirming *Sosebee*'s holding "that restitution [under the MVRA] falls outside the bounds of the Sixth Amendment" and rejecting contention that *Southern Union* "calls *Sosebee* into question"); *United States v. Rogers*, 580 F. App'x 347, 352 (6th Cir. 2014) (rejecting argument that defendant was entitled to a "jury finding on the loss-amount for restitution purposes," noting that other circuits are in accord, and distinguishing *Southern Union*); *United States v. Jarjis*, 551 F. App'x 261, 261–62 (6th Cir. 2014) (per curiam) (same); *see also United States v. Agbebiyi*, 575 F. App'x 624, 632–33 (6th Cir. 2014) (holding that *Apprendi* and *Southern Union* do not require facts underlying MVRA restitution calculations to be found by a jury). Similarly, every circuit court (except the Federal Circuit) has held that *Apprendi* does not apply to the MVRA. *See United States v. Bengis*, 783 F.3d 407, 411–13 (2d Cir. 2015); *Jarjis*, 551 F. App'x at 261–62 (citing cases from Fourth, Seventh, and Ninth Circuits); *United States v. Milkiewicz*, 470 F.3d 390, 403–04 (1st Cir. 2006) (citing cases from

Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits). Many of these cases have also distinguished *Southern Union* and held that it does not extend *Apprendi*'s rule to restitution. For all these reasons, we conclude that the district court's restitution order was proper.

## III. CONCLUSION

Because the district court did not commit any reversible evidentiary errors and properly took account of dismissed or acquitted conduct in sentencing Churn, we affirm its judgment.