NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 19a0244n.06

Case No. 18-1172

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff-Appellee,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>ON APPEAL FROM THE UNITED</td></tr>
<tr><td>v.</td><td>)</td><td>STATES DISTRICT COURT FOR</td></tr>
<tr><td></td><td>)</td><td>THE EASTERN DISTRICT OF</td></tr>
<tr><td>MAHMOUD RAHIM,</td><td>)</td><td>MICHIGAN</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant-Appellant.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

**FILED**
May 07, 2019
DEBORAH S. HUNT, Clerk

BEFORE: SUHRHEINRICH, THAPAR, and LARSEN, Circuit Judges.

THAPAR, Circuit Judge. Doctor Mahmoud Rahim made money by referring his patients to other doctors in exchange for kickbacks. As a result of this practice, a jury convicted him of healthcare fraud. He appeals his conviction and sentence. We affirm.

I.

Rahim teamed up with other physicians, including Rizwan Qadir, to accept kickbacks in exchange for patient referrals. Rahim would refer patients to Qadir, a neurologist, who in turn paid Rahim (1) a flat fee per month and (2) additional referral fees each time Rahim referred a patient for an EMG (a muscle test) or physical therapy. Rahim referred nearly three quarters of his patients to Qadir for an EMG, physical therapy, or both. An EMG is an invasive and sometimes painful test that involves sticking needles into a patient's muscles. And Rahim referred patients

for this test even when Qadir believed the test was unnecessary or the patient complained about not wanting another EMG. But at least the EMG was a real test performed by a real doctor. That much can hardly be said about the physical therapy. Rahim referred his patients to unlicensed "physical therapists" who prescribed the exact same plan of care for every patient, regardless of the patient's condition.

Many of Rahim's patients were Medicare beneficiaries, and it is a crime to submit fraudulent bills to Medicare or to give or receive kickbacks in connection with treating Medicare patients. 18 U.S.C. §§ 371, 1347; 42 U.S.C. § 1320a-7b(b)(1). So Rahim tried to make his fraud fly under the government's radar. To hide the kickbacks, Rahim attempted to make it look like Qadir was simply paying him rent for office space. Qadir would write Rahim two kickback checks each month. One was always for the same amount and had "rent" or "lease" written in the memo line. The other was for any extra referral fees and generally went to another company, including a shell company that someone else, such as Rahim's son or an employee, technically "owned" but that Rahim controlled. The only time they did not use this method of payment was when Rahim went through bankruptcy; during that time, Qadir paid Rahim in cash to avoid bankruptcy-court scrutiny.

Despite Rahim's best efforts to conceal this fraud, the government eventually caught on. It charged Rahim with (1) conspiracy to commit healthcare fraud and wire fraud, (2) wire fraud, (3) conspiracy to pay and receive healthcare kickbacks, and (4) receipt of kickbacks in connection with a federal healthcare program (Medicare). A jury convicted Rahim on all charges, and he was sentenced to seventy-two months in prison. On appeal, Rahim claims the district court made several errors—both during the trial and at sentencing.

II.

A.

At trial, Rahim claimed that Qadir's monthly checks were rent payments, not kickbacks. But the government introduced evidence from Rahim's bankruptcy proceedings to show otherwise. First, the government used the bankruptcy evidence to rebut Rahim's claim that Qadir was a tenant. Second, the government used the bankruptcy evidence to explain a gap in time where Rahim did not receive any rent checks from Qadir.

*Rebuttal*. During his bankruptcy proceedings, Rahim listed his tenants on multiple occasions, but he never included Qadir. The government argued that this proved that Qadir was not in fact a tenant, and therefore, his payments to Rahim were not for rent. This evidence was introduced in two forms: Rahim's own testimony during the bankruptcy proceedings and a bankruptcy examiner's report that summarized Rahim's statements.

*Missing checks*. The government also needed to explain to the jury why Qadir's rent checks ceased for two years. Again, the answer was the bankruptcy proceedings. The government's theory was that Rahim had Qadir pay him in cash rather than checks during this period because the bankruptcy court was scrutinizing Rahim's finances.

Rahim objected to the introduction of the bankruptcy evidence, arguing that it (1) was hearsay, (2) was a prior act offered to prove character, and (3) presented a risk of unfair prejudice, wasting time, or confusing the issues. *See* Fed. R. Evid. 802, 404(b), 403. The court overruled the objections and admitted the evidence.

On appeal, Rahim adds a new argument: the admission of the evidence violated the Confrontation Clause. We review his three renewed challenges for abuse of discretion, but we

review his new Confrontation Clause challenge for plain error. *United States v. Churn*, 800 F.3d 768, 774–75 (6th Cir. 2015); *United States v. Demjanjuk*, 367 F.3d 623, 629 (6th Cir. 2004).

*Hearsay.* First, Rahim argues that the bankruptcy examiner's report is inadmissible hearsay. Hearsay is (1) an out-of-court statement (2) offered for the truth of the matter asserted in that statement. Fed. R. Evid. 801(c). But although certain statements look like hearsay, walk like hearsay, and talk like hearsay, they are "not hearsay" under the Federal Rules of Evidence. *See* Fed. R. Evid. 801(d). One example is when a party makes a statement outside of court and the other side uses that statement against him at trial; that is "not hearsay." Fed. R. Evid. 801(d)(2)(A). So when the government offered Rahim's own statements from the bankruptcy proceedings, they were "not hearsay." *United States v. Lay*, 612 F.3d 440, 448 (6th Cir. 2010). Rahim concedes as much. And this concession is fatal to his objection to the bankruptcy examiner's report. Why? Because while the bankruptcy examiner's report is an out-of-court statement that should not have been admitted, any error in admitting it was harmless. The report merely summarized what the jury had already heard in the form of Rahim's own statements—that Qadir was not a tenant. *See* *United States v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009) (explaining that an error in admitting a hearsay statement is subject to harmless error analysis).

Plus, there was additional overwhelming evidence of Rahim's guilt. The jury saw videos of Rahim accepting kickback checks; heard from Qadir and another witness that they had paid Rahim kickbacks; and saw an in-depth analysis of Qadir and Rahim's Medicare billings, patient records, and the money they exchanged. Finally, the jury heard evidence that Rahim referred some patients for treatments that were not in their best interest. Given all this evidence, we cannot say that "it is more probable than not that the error materially affected the verdict." *See id.* Accordingly, any error in admitting the bankruptcy examiner's report was harmless.

*Confrontation Clause*. Rahim also argues that the bankruptcy examiner's report has a different fatal flaw—its admission violated the Confrontation Clause. *See* U.S. Const. amend. VI. The Confrontation Clause grants a criminal defendant the right to confront the witnesses against him. *Id.* A "witness" includes someone who made an out-of-court statement if that statement is offered for its truth and is "testimonial." *United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011). "A statement is testimonial if a reasonable person in the [speaker's] position would have anticipated the use of the statement in a criminal proceeding." *Id.*; *accord Williams v. Illinois*, 567 U.S. 50, 84 (2012) (plurality opinion) ("We look for the primary purpose a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances."). Even assuming admission of the bankruptcy examiner's report violated the Confrontation Clause, its admission was not plain error. As mentioned above, the bankruptcy report was cumulative of other admissible evidence, and given the overwhelming nature of the evidence offered against Rahim, his substantial rights were not violated. *See United States v. Warman*, 578 F.3d 320, 347 (6th Cir. 2009) (finding no plain error from a Confrontation Clause violation because of "the ample evidence introduced by the government of [the defendant's guilt]").

*Character evidence*. Rahim also argues that the government used his past act (filing for bankruptcy despite his high income) to prove that he is a bad person who generally does bad things (like committing healthcare fraud). *See* Fed. R. Evid. 404(b)(1). But the government did not offer this bankruptcy evidence to prove that Rahim is generally a bad person. As discussed above, the government offered this evidence to demonstrate that the "rent" checks were kickbacks and to explain the two years without checks. Thus, the evidence was an integral part of the proof of his crimes—not bad character evidence. *See Churn*, 800 F.3d at 779 ("[T]he testimony explains the

relationship between the witness and the defendant . . . and the course of their business dealings." (internal quotation marks omitted)).

*Unfairly prejudicial.* Finally, Rahim argues that the bankruptcy evidence was unfairly prejudicial, wasted time, and confused the issues. A district court has broad discretion in determining whether the danger of admitting evidence substantially outweighs that evidence's probative value. Fed. R. Evid. 403; *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018) (reviewing Rule 403 determination for abuse of discretion). As just discussed, the evidence was highly probative. And the risk of prejudice was minimal: the government did not argue that Rahim had done something wrong when he filed for bankruptcy, nor did it argue that Rahim's high income somehow made him blameworthy. Rather, the government used this evidence in a targeted way to argue that Qadir's payments were kickbacks that Rahim deliberately concealed while he went through bankruptcy proceedings. Because the government used this evidence in such a limited manner, the evidence also did not present a substantial risk of wasting time or confusing the issues.

All in all, Rahim's various challenges to the bankruptcy evidence lack merit.

B.

Next, Rahim challenges testimony from Jina Berro, a massage therapist at Qadir's "physical therapy" practice. Berro testified that some patients told her they neither wanted nor needed physical therapy, but "the doctor [told] them to get physical therapy before getting their refill [of narcotics]." R. 81, Pg. ID 742–43. Rahim argues that this testimony (1) was irrelevant and unduly prejudicial in violation of Rule 403 and (2) amounted to a character attack in violation of Rule 404(b)(1). Since Rahim did not object on these grounds at trial, we review for plain error. *Demjanjuk*, 367 F.3d at 629.

*Unfairly prejudicial*. Rahim argues that the district court should have excluded this evidence because the risks of unfair prejudice and of misleading the jury substantially outweighed its probative value. *See* Fed. R. Evid. 403. But the court's balancing of these concerns was not error, plain or otherwise. On the one hand, this evidence was probative: it made it more probable that Rahim received kickbacks in exchange for referrals. *See* Fed. R. Evid. 401. Qadir had already testified that he paid Rahim to refer patients to him for physical therapy. So Berro's testimony corroborated Qadir's testimony by making it more likely that Rahim referred patients for physical therapy based on kickbacks, not medical necessity. *See United States v. Hawkins*, 969 F.2d 169, 173–74 (6th Cir. 1992) (explaining that evidence was probative because it corroborated the testimony of a previous witness). Against this probative value hung but a slight risk of unfair prejudice. Rahim contends that the testimony was inflammatory because it suggested that he illegally wrote prescriptions for unnecessary narcotics. But Berro did not testify that the *narcotics* were unnecessary; she said that the *physical therapy* was unnecessary. And while it is *possible* that a jury could have concluded that Rahim wrote unlawful narcotics prescriptions and improperly held that fact against him, that risk does not substantially outweigh the evidence's probative value. Plus, the government introduced this evidence only briefly and never mentioned it again. Given the very minor role it played in the trial, it was unlikely to mislead the jury.

*Character evidence*. Rahim also argues that the government improperly used this evidence as a separate wrongful act to once again prove that he is a bad person who does bad things (such as write illegal prescriptions and commit healthcare fraud). *See* Fed. R. Evid. 404(b)(1). But the government did not use this evidence to prove Rahim's bad character; it was direct evidence of healthcare fraud. *See United States v. Martinez*, 430 F.3d 317, 335 (6th Cir. 2005). The healthcare

fraud conspiracy centered around patient referrals and included evidence that patients received unnecessary physical therapy. Berro's testimony was merely further proof of that conspiracy.

C.

Rahim also argues that the case agent, FBI Agent Bryan Drake, provided inadmissible opinion testimony. While Agent Drake was explaining his role in the investigation and the evidence he uncovered, he testified about certain evidence that generally functions to "pique [the FBI's] interest" or as a "red flag" for healthcare fraud. R. 80, Pg. ID 486, 495. First, Agent Drake testified about suspicious evidence in banking records—for example, when the memo line of a check says "marketer," "liaison," or "rent," or numerous checks have round numbers ending in multiple zeroes, such as $500 or $1000. He also testified that when a suspect's child legally owns a company that the suspect actually controls—"like in this case"—it is usually a "red flag" that the suspect is "hiding the use of [the] account." R. 80, Pg. ID 495. Rahim contends that the court should have excluded this testimony for two reasons: (1) it was expert testimony, and Agent Drake was not qualified to testify as an expert witness; and (2) it "spoon fed" conclusions about the evidence to the jury. Rahim did not object to Agent Drake's testimony at trial or request a limiting instruction regarding this testimony, so we review his claims for plain error. *United States v. Al-Maliki*, 787 F.3d 784, 791 (6th Cir. 2015). The district court did not commit any error, plain or otherwise.

*Expert testimony*. A district court may admit opinion testimony in one of two forms. The first is lay opinion testimony. Lay opinion testimony is admissible if it is (1) "rationally based on the witness's perception," (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and (3) is "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. Alternatively, a court may admit expert opinion testimony.

An expert's opinion testimony is admissible if his "scientific, technical, or other specialized knowledge will help the [jury] to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Unlike lay testimony, expert testimony may only come from a witness who is qualified as an expert. *Id.*; *United States v. Lopez-Medina*, 461 F.3d 724, 742 (6th Cir. 2006) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Among other things, an "expert" must have sufficient "knowledge, skill, experience, training, or education[,]" and use "reliable principles and methods." Fed R. Evid. 702. So the distinction between lay and expert opinion testimony matters.

Yet that distinction is "far from clear" when, as here, a fact witness also happens to have specialized knowledge. *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007). In these instances, a witness becomes a dual witness—offering both lay and expert testimony. *Id.* at 403–04. For example, a seasoned law enforcement officer provides expert testimony if he testifies about drug dealers' methods of operation, such as their use of disposable phones and the quantities of drugs that are consistent with distribution, not personal use. *United States v. Ham*, 628 F.3d 801, 804–05 (6th Cir. 2011); *see also United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004) (concluding that an officer provided expert testimony when he testified that drug traffickers generally have guns to protect their products).

Agent Drake testified as a dual witness. He not only testified about the facts of this investigation (lay testimony), but he also relied on his specialized training and experience with the FBI to explain that certain evidence generally makes the FBI suspicious of healthcare fraud (expert testimony). This is similar to testimony about the way a crime is typically committed. So Rahim argues that the district court should not have permitted this expert testimony because Agent Drake was not qualified to testify as an expert on healthcare fraud. But Rahim does not explain why a

person who has worked as an FBI agent for ten years—four of which were on the Healthcare Fraud Unit—is not qualified to testify about healthcare fraud investigations. Thus, failing to qualify Agent Drake was not plainly erroneous because he was obviously qualified to testify as an expert on healthcare fraud. *See Lopez-Medina*, 461 F.3d at 742–43 (holding that failing to "qualify the witness[] formally" is not an abuse of discretion when the witness is "obvious[ly] qualifi[ed]" to testify about drug trafficking because he had worked at the DEA for six years).

*"Spoon feeding."* Regardless of whether testimony is lay or expert, a witness may not "spoon feed" conclusions about evidence to the jury when the jury is able to evaluate the evidence for itself. *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013); *see also United States v. Kilpatrick*, 798 F.3d 365, 380 (6th Cir. 2015). For example, a case agent may not interpret recorded phone calls during his testimony if those calls are played for the jury and involve only "ordinary language." *Freeman*, 730 F.3d at 593, 597–98. But Agent Drake's testimony did not form conclusions for the jury. He merely testified that some of the evidence "piqued [the FBI's] interest" and encouraged further investigation. R. 80, Pg. ID 502. His testimony did not provide the jury with a definitive opinion on whether this suspicious evidence meant that Rahim committed healthcare fraud. In fact, on cross-examination, Agent Drake admitted that he was "*not* suggesting that every time somebody writes 'rent' on a check that it's a fraud." R. 80, Pg. ID 519 (emphasis added). Thus, the district court did not plainly err in admitting this testimony.

III.

Rahim also challenges his seventy-two-month sentence. In calculating Rahim's sentence, the court took into consideration the amount of loss from Rahim's fraudulent kickback scheme. He contends that the loss calculation was error. We review the court's method of calculating the loss de novo. *United States v. Maddux*, 917 F.3d 437, 450 (6th Cir. 2019).

Rahim does not fully explain where he thinks the court went wrong in its calculation. He had two types of arguments available. First, he could have developed a legal challenge to the commentary note that the district court applied. This commentary note says that the aggregate dollar amount of fraudulent bills submitted to the federal government healthcare program is "prima facie evidence of the amount of the intended loss." U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(F)(viii) (U.S. Sentencing Comm'n 2016). But Rahim simply says that the note "is in error." Appellant Br. 42. That cursory statement is insufficient to overcome *Stinson* deference. *See Stinson v. United States*, 508 U.S. 36, 38 (1993). *But see United States v. Havis*, 907 F.3d 439, 450–52 (6th Cir. 2018) (Thapar, J., concurring) (arguing that *Stinson* deference should be reconsidered). And it is especially insufficient here because Congress—as part of the Affordable Care Act—actually commanded that the Sentencing Commission add this note to the Guidelines. *See* Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 1006–07.

Second, Rahim could have developed a fact-based challenge to the district court's calculation. The commentary note provides that a defendant may rebut the "prima facie" evidence of loss by showing that he actually intended to receive *less* than the amount he billed. U.S.S.G. § 2B1.1 cmt. n.3(F)(viii). To this end, Rahim offers only one passing sentence that he, like most people, knew that Medicare does not reimburse the full amount billed. But he does not point to any evidence that he introduced in the district court to rebut the "prima facie" evidence, and it is not our job to construct his argument for him. *See United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016). Accordingly, we affirm Rahim's sentence.

## IV.

In one last attempt to challenge his conviction, Rahim argues that even if none of the errors alone are enough to constitute reversible error, they are sufficient when combined. But a

cumulative-error claim requires more than one error. *United States v. Underwood*, 859 F.3d 386, 395 (6th Cir. 2017). And the district court committed only one arguable error—which was harmless. So Rahim's final claim fails.

We affirm.