NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0540n.06

Case No. 21-2772

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | **FILED** Dec 27, 2022 DEBORAH S. HUNT, Clerk |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| CALVIN COLBERT, JR., | ) ) | |
| Defendant-Appellant. | ) | |
| | | OPINION |

Before: GUY, WHITE, and LARSEN, Circuit Judges.

**RALPH B. GUY, JR., Circuit Judge.** A jury found Calvin Colbert, Jr., guilty of both a drug distribution conspiracy and a related money laundering conspiracy. *See* 21 U.S.C. §§ 846 and 841(a)(1); 18 U.S.C. § 1956(h). Colbert appeals only the first of these, arguing that the evidence established no more than a buyer-seller relationship; that a fatal variance occurred between the evidence and the indictment; and that the district court's refusal to give one or more requested jury instructions entitles him to a new trial. Colbert also appeals the application of a two-level increase in his offense level imposed because "a dangerous weapon (including a firearm) was possessed." U.S. Sentencing Guidelines Manual (USSG) § 2D1.1(b)(1) (2018). For the reasons that follow, we affirm.

I.

Colbert was tried alone and the evidence presented during his five-day jury trial revolved around the interception of six packages over a six month period. Four of the packages were sent from California to Michigan and contained bulk quantities of methamphetamine, heroin, fentanyl, marijuana and/or cocaine; the other two packages contained bundles of cash sent from Michigan by Johaun Howland directly to Calvin Colbert at his apartment on Bonsallo Avenue in Los Angeles, California. An investigation began in November 2017, when a U.S. Postal Service (USPS) Inspector identified a pattern of packages sent from California to the Grand Rapids, Michigan area that were all tracked from the IP address associated with Colbert's Bonsallo apartment. Multiple law enforcement agencies were drawn into the investigation, which included not only seizure of the intercepted packages but also physical and electronic surveillance, a Title III wiretap on Howland's cell phone, the tracking of packages, and money transfers.

Howland was charged first, but the investigation led to a series of indictments culminating in the Sixth Superseding Indictment against Howland, Colbert, and a number of coconspirators. Colbert challenges his conviction and sentence under Count 1, which alleged that Howland, Colbert and others (named and unnamed) conspired to distribute and possess with intent to distribute controlled substances, including methamphetamine, heroin, fentanyl, marijuana, and cocaine, from January 2017 through September 2018, "in the Western District of Michigan, Southern Division, and elsewhere." A sketch of the evidence presented at trial concerning Colbert's connections to the intercepted packages—including testimony from three coconspirators—sets the stage for the issues raised in this appeal.

A.

In December 2017, USPS intercepted a package containing 444 grams of methamphetamine and 985 grams of cocaine sent by a fictitious "Santa Clauce" and addressed to "Shirley Darling" at 301 Gene Street, SW, Wyoming, Michigan. On the day it was sent, Colbert was seen leaving his apartment with his brother Cavon Ziegler and Ziegler was carrying a package that he mailed from a post office in the greater Los Angeles area. The package's 22-digit tracking number was used to track that package from Colbert's apartment. Ultimately, that same tracking number was extracted from the cell phone that Colbert was carrying at the time of his arrest.

In January 2018, USPS intercepted a package containing $10,040 in U.S. Currency that was sent from Michigan to Calvin Colbert at his apartment on Bonsallo Avenue. A transfer of $10,000 or more made through a bank would have triggered reporting requirements. Considerable evidence established that money remitting services, including "Walmart to Walmart," also were used to transfer money from Howland or his nominees (*i.e.*, persons who agreed to send items) in Michigan to Colbert, Ziegler, or other nominees in California or Nevada.

Specific evidence of such transfers came in through the testimony of Jamica Taylor, who had lived with Howland during the relevant period and was named in the Sixth Superseding Indictment as a coconspirator but pleaded guilty to a lesser charge. Taylor testified that Howland used different people to send money and receive packages and admitted that she wired money at Howland's direction that she knew was for the purchase of drugs from Howland's supplier in California. Text messages extracted from Taylor's cell phone confirmed that, in December 2017, she used money transfer services at Howland's direction to send thousands of dollars (but less than

$3,000 at a time) to the names he gave her.[1] Taylor's messages also reflected a transfer of money to Howland when he was in California to buy drugs in late January 2018. Taylor testified that Howland told her that his source was a guy in California named "Cal" or "Calvin," although Taylor never met, spoke to, or texted with Calvin Colbert.

In late February 2018, Howland mailed a package from Sun City, California, that listed the sender as "Nick Byron" in San Bernadino, California, and the recipient as "Malik Matthis" at an address in Kalamazoo, Michigan. Inside this package was a plastic plant food bucket that contained 798.37 grams of fentanyl, 47.97 grams of heroin, and 989.9 grams of cocaine. There was evidence that when that package was not delivered as expected, Colbert played a role in trying to locate it.

Specifically, messages on Colbert's cell phone showed: that Colbert contacted Destiny Brown, a friend who worked for USPS; that Colbert provided Brown with the tracking number for that package; and that Colbert asked Brown to try to find out what had happened to it. A USPS manager in Kalamazoo testified that someone named "Destiny" or "Angel" called to ask about the missing package and said she was a postal employee. Colbert learned from Brown that the package had been marked for return, but she said he should not send anyone to get it because "they [are] trying to build a case." The fourth package was intercepted on March 2, 2018. It was also sent from San Bernadino, California, but this time it was addressed to Howland's friend and codefendant Mark Martin at his residence in Grand Rapids. In it was another plastic plant food bucket, which contained 1.2 kilograms of marijuana.

---

[1] The jury heard evidence that a wire transmission over $3,000 would trigger additional information requirements.

On April 4, 2018, a FedEx package was intercepted by the Indiana State Police that held a box with a locked digital safe inside and, once opened, was found to contain $44,295 in bundled U.S. currency. Taylor testified that she saw Howland pack money into the safe and that she had no doubt that this money was from selling drugs. Instead of using nominees to send and receive this large amount of cash, Howland used his own return address and had it sent to Calvin Colbert at his apartment on Bonsallo Avenue.

When FedEx did not deliver this package the next day as expected, Howland called FedEx, left his contact information, and tried to explain that he sent this cash to Colbert's company KB Entertainment because they were trying to put on a show. Howland provided the Indiana State Police with a combination for the safe, but it did not work. Colbert called separately to confirm that the police had the package and left his phone number. When an Indiana State trooper called Colbert back, Colbert agreed that the cash was for a show but said he was expecting $60,000. When Colbert said he did know how to get into the safe, a warrant was obtained and the safe was opened with a pry bar.

In early May 2018, the last USPS package was intercepted and found to contain 744 grams of cocaine hidden inside a gift-wrapped crockpot. Law enforcement was aware of this package from the wiretap on Howland's cell phone; that is, they knew when Christian Newbern had agreed to receive a package for her cousin Howland. Newbern was charged for the drug trafficking conspiracy but pleaded guilty to a lesser offense. She testified that she had agreed to received some packages for Howland at her apartment on Richmond Street, NW, in Grand Rapids. Messages extracted from Newbern's phone included texts with Howland about three packages.

Howland was under surveillance when he learned that the USPS had marked the package as "delivered." Howland was heard calling Newbern from a nearby parking lot with instructions

to, among other things, complain to the post office about it. Howland was also heard telling another coconspirator that "Cal called" and "he refresh[ed] the thing" and saw the package was marked as "delivered." Although Newbern said she never spoke to or texted with Colbert, Newbern's address was found on Colbert's cell phone after his arrest.

Further evidence of Colbert's role in the conspiracy was offered through Shanika Daughtry, who asserted her Fifth Amendment rights and received testimonial immunity. Daughtry said she met Colbert in 2017, dated him on and off for about year, and had mailed five packages, delivered drugs, and picked up and dropped off money as directed by Colbert. And, specifically, Daughtry testified that she mailed the last package containing cocaine to Newbern at Colbert's direction.

Daughtry explained that Colbert had her come to get the cocaine from his apartment on Bonsallo; that it was Colbert who gave her Newbern's name and address; and that Colbert instructed her to drive home to Las Vegas and ship the cocaine to Newbern from there. Daughtry also delivered some cocaine to a few customers in Las Vegas at Colbert's direction and took the money back to Colbert. Daughtry described putting the cocaine in a crockpot, wrapping it to look like a present, and mailing it to Newbern using a fictitious return address so it would not be tracked back to her. The crock pot was Daughtry's idea. Finally, there was evidence that when that package came up missing, Colbert and Daughtry exchanged Facebook messages expressing concern that it had not been received by Newbern.

B.

Under surveillance in September 2018, Colbert was arrested in a traffic stop shortly after leaving his apartment with a black backpack. Colbert had a cell phone and the backpack contained $48,000 in U.S. currency with him. A search warrant for Colbert's apartment was executed the same day, and investigators seized food sealers and vacuum bags from the kitchen, two cell phones

from a closet, and a digital scale from the nightstand by the bed in the first bedroom. Another cell phone was found under the bed in that bedroom and a fourth was found on the nightstand. No drugs were seized, but a loaded 9 mm Smith & Wesson handgun was found under some clothes in stacked baskets stored in a bedroom that did not have a bed in it. The firearm was the basis for the charge in Count 7 of the Sixth Superseding Indictment—that Colbert possessed that handgun in furtherance of the drug trafficking conspiracy. *See* 18 U.S.C. § 924(c)(1)(A)(i).

At the close of the government's proofs, Colbert moved for judgment of acquittal on all counts. The district court granted the motion, in part, dismissing only Count 7 because there was "no evidence that the gun was employed in connection with, in furtherance of the drug conspiracy." PageID 4849. Colbert elected not to testify, but presented testimony from his former girlfriend Kelly Johnson, who said Colbert's brother Ziegler had been using one of Colbert's phones and claimed that she was told Colbert would be "set up" by Daughtry. During the charging conference, the district court denied Colbert's request for a buyer-seller instruction, a multiple-conspiracy instruction, and an other-acts limiting instruction.

The jury found Colbert guilty on Counts 1 and 2, and made specific findings that Colbert was responsible for 50 grams or more of methamphetamine, 400 grams or more of a mixture containing fentanyl, and 500 grams or more of a mixture containing cocaine. The district court denied Colbert's renewed motion for judgment of acquittal or new trial in a written opinion and order. At sentencing, as is relevant here, the district court overruled Colbert's objection to a two-level firearm enhancement under USSG § 2D1.1(b)(1). Nevertheless, the district court varied downward substantially from the Guidelines range and sentenced Colbert to concurrent 240-month terms of imprisonment. This appeal followed.

II.

We start with Colbert's challenge to the sufficiency of the evidence because "it determines whether there can be a retrial if [his] other arguments succeed." *United States v. Hamm*, 952 F.3d 728, 736 (6th Cir. 2020). A district court's denial of a defendant's motion for judgment of acquittal is reviewed de novo. *See United States v. Collins*, 799 F.3d 554, 589 (6th Cir. 2015). The "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the jury's job—not ours—"to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts." *Id*. Accordingly, "we must 'draw all available inferences and resolve all issues of credibility in favor of the jury's verdict.'" *United States v. Hills*, 27 F.4th 1155, 1172 (6th Cir. 2022) (quoting *United States v. Conatser*, 514 F.3d 508, 519 (6th Cir. 2008)).

"Stated succinctly, a drug conspiracy requires the government to show that two or more individuals have agreed to violate a drug law (such as § 841(a)(1)'s ban on distributing [or possessing with intent to distribute] drugs) and that the defendant knowingly and voluntarily entered into this agreement." *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021). It is long recognized, however, that a "buyer-seller relationship alone is insufficient to tie [a defendant] to a conspiracy." *Hamm*, 952 F.3d at 736 (quoting *United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009)). That is the case because the buy-sell transaction itself does not prove "an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction." *Id*. (quoting *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991)); *see also Wheat*, 988 F3d at 307-08 (tracing rule to the foundational common-law rule of conspiracy).

The requirement that "two parties must agree to a crime beyond their own exchange of drugs distinguishes an illegal conspiracy from an illegal distribution." *Wheat*, 988 F.3d at 312.

Colbert does not—and cannot—dispute that there was sufficient evidence to establish that a conspiracy to distribute and possess with intent to distribute controlled substances existed. Rather, Colbert contends that no rational jury could have found that he joined that agreement beyond his mere buyer-seller transactions with Howland. We disagree.

The agreement, of course, can be a tacit one and the "government may meet its burden of proof through circumstantial evidence." *United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021) (quoting *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999)). Here, there was more than sufficient evidence from which a rational trier of fact could reasonably infer that Colbert was part of a "chain" conspiracy such as when "a wholesaler sells to a retailer and the two have reached an agreement that the retailer will resell to end users." *Wheat*, 988 F.3d at 308 (citing *United States v. Henley*, 360 F.3d 509, 513-14 (6th Cir. 2004)). Colbert emphasizes that the evidence did not show the drugs were "fronted," but that is simply one kind of circumstantial evidence that would show "a resale agreement beyond their own exchange." *Id*. at 309.

An agreement for further distribution of drugs may be established by circumstantial evidence such as "advance planning, ongoing purchases or arrangements, large quantities of drugs, standardized transactions, an established method of payment, and trust between the buyer and seller." *Williams*, 998 F.3d at 728 (citing *Deitz*, 577 F.3d at 680-81). There is evidence of each kind here. The government did not have evidence of the communications between Colbert and Howland—but a reasonable juror could infer an agreement beyond just a buyer-seller transaction.

There was evidence that Colbert engaged in advance planning that included his use of nominees to send drugs by mail, his knowledge of the names and addresses of the intended

recipients of those packages, his tracking of those packages, and the systematic use of nominees to receive money that was collected and delivered to him. The investigation successfully intercepted four packages over a six-month period of what could only be considered distribution quantities of controlled substances—*i.e.*, 444 grams of 99% pure methamphetamine and 985 grams of cocaine (package #1); 798 grams of fentanyl, 989 grams of cocaine, and 47 grams of heroin (package #2); 1.2 kilograms of marijuana (package #4), and 744 grams of cocaine (package #6). Colbert's knowledge of further distribution "may be inferred from the interrelated nature of the drug business or the volume of drugs involved." *Id*. at 728 (quoting *United States v. Hitow*, 889 F.2d 1573, 1577 (6th Cir. 1989)).

Additionally, the evidence established that Colbert and Howland had an agreement that Colbert would send drugs to nominees, who would later deliver the drugs to Howland—the totality of which reflects a drug conspiracy. Further, Daughtry, a nominee, testified that Colbert gave her drugs and directed her to ship them to Howland's nominees in Michigan. Colbert recognizes that Daughtry's testimony suggests he had more than a buyer-seller relationship with Howland, but he nevertheless contends that "Daughtry's testimony is of dubious credibility." Reply Br. at 6. This argument is off-target. We must "resolve all issues of credibility in favor of the jury's verdict," which here was that Colbert is guilty of a drug conspiracy. *Hills*, 27 F.4th at 1172 (quoting *Conatser*, 514 F.3d at 519).

Nor is this case similar to *Wheat*, where "the defendant had a single meeting with a person named Reels and provided Reels with a free sample of heroin" but "Reels decided not to purchase any heroin and the two went their separate ways." *Williams*, 998 F.3d at 730 (distinguishing *Wheat*, 988 F.3d at 305). Reels had given the sample to someone he used as a "tester," but there was no basis to infer that Wheat knew that Reels would redistribute the one-time sample to be used

by a tester. *Wheat*, 988 F.3d at 311. Colbert argues that he did not know what Howland did with the drugs once they arrived in Michigan. Br. p. 19. Colbert may not have known the details of Howland's operation, but it is sufficient in a drug distribution "chain" conspiracy "to show that each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy." *United States v. Martinez*, 430 F.3d 317, 332-33 (6th Cir. 2005).

Viewed in the light most favorable to the verdict, the evidence was sufficient for a reasonable juror to find beyond a reasonable doubt that Colbert knowingly participated in a conspiracy to distribute or possess with intent to distribute controlled substances.[2]

III.

A.

Colbert argues that there was a fatal variance in the proofs as to the drug distribution conspiracy. A variance arises "when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006). Reversible error occurs if the defendant demonstrates both prejudice and that although the indictment alleged one conspiracy "the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies." *Id*. at 236

---

[2] Colbert also contends that the district court misstated the proof required in denying his renewed motion for acquittal. Specifically, Colbert challenges the statement that "[t]his evidence could lead a rational jury to find § 846's elements:  that Defendant knowingly and voluntarily participated and joined a conspiracy *or* intentionally participated in the repeated sale of large quantities of drugs," arguing that it is not an either/or proposition. PageID 5708 (emphasis added). But Colbert takes the district court's statement out of context. The district court correctly stated, consistent with our case law, that the jury could have found an actual agreement or inferred such agreement from the repeated sale of large quantities of drugs. *See United States v. Sills*, 662 F.3d 415, 417 (6th Cir. 2011). To the extent that this argument is sufficiently developed for us to consider, there is no error.

(quoting *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982)). We review the number of conspiracies "in the light most favorable to the government, considering 'the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings.'" *Williams*, 998 F.3d at 730 (citations omitted).

Here, Count 1 charged a single conspiracy involving Colbert, Howland, and others (named and unnamed) to distribute or possess with intent to distribute controlled substances "in the Western District of Michigan, Southern Division, and elsewhere." Colbert contends that Daughtry's testimony actually showed there were two separate conspiracies—one involving Howland, Colbert, Daughtry and others to distribute drugs in Grand Rapids and a separate and distinct conspiracy involving Colbert and Daughtry to distribute drugs in Las Vegas. So what was the evidence?

Daughtry testified that Colbert asked her to mail packages of cocaine—five in all—and had her drop off cocaine to a few people in Las Vegas. Daughtry also said Colbert had her bring him the money she received from selling his drugs and from any packages of cash she received in her capacity as his nominee. With respect to the intercepted crockpot of cocaine, Daughtry explained that Colbert had her pick up cocaine from his apartment, provided her the name and address for Howland's cousin, and directed her to drive to Las Vegas and mail the cocaine to Howland's cousin from there. She also took cocaine to sell to a few customers in Las Vegas at Colbert's direction; Daughtry did so and returned the money to Colbert. In short, Daughtry said she got drugs from Colbert and "sent them off or sold them."

This evidence did not support a finding of a separate conspiracy involving only Colbert and Daughtry. "A single conspiracy is not converted to multiple conspiracies simply because it can be subdivided" or "because each member of the conspiracy did not know every other member,

or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *United States v. Beals*, 698 F.3d 248, 259 (6th Cir. 2012) (citations omitted). Because a rational trier of fact could find that Daughtry played several roles in a single conspiracy—including acting as an intermediary in the delivery of drugs by mail and in person— no variance occurred. For the same reason, there also was no constructive amendment. *United States v. Prince*, 214 F.3d 740, 757 (6th Cir. 2000) (explaining that constructive amendment arises where "a variance infringes too strongly upon the defendant's Sixth Amendment right to be informed of the nature and cause of the accusation"); *see also United States v. Smith*, 749 F.3d 465, 483 (6th Cir. 2014) ("Because we conclude that there was no variance, we have no need to address the issue of constructive amendment.").

B.

When a defendant has preserved an objection to the jury instructions, this court must determine "whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *United States v. Blood*, 435 F.3d 612, 623 (6th Cir. 2006) (citation omitted); Fed. R. Crim. P. 30(d); *see also Jones v. United States*, 527 U.S. 373, 391 (1999). Refusal to give a requested instruction is reversible error "only if (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case." *United States v. Newcomb*, 6 F.3d 1129, 1132 (6th Cir. 1993); *see also Williams*, 998 F.3d at 732. Of course, "an instruction should not be given if it lacks evidentiary support or is based upon mere suspicion or speculation." *United States v. James*, 819 F.2d 674, 675 (6th Cir. 1987) (quoting *United States v. McLister*, 608 F.2d 785, 791 (9th Cir. 1979)). A district court's refusal to give a requested

instruction is reviewed for abuse of discretion. *See United States v. Pritchard*, 964 F.3d 513, 522 (6th Cir. 2020).

*Buyer-Seller Instruction*. The district court rejected Colbert's request for the Seventh Circuit's buyer-seller instruction, agreeing with the government that the evidence did not support it.[3] This court has said that we generally will not reverse for failure to give a buyer-seller instruction, *Wheat*, 988 F.3d at 311, "when, as here, the district court gives complete instructions on the elements of conspiracy," *Williams*, 998 F.3d at 732. Moreover, even the Seventh Circuit has held that its buyer-seller instruction should *only* be given "where the jury could rationally find, from the evidence presented, that the defendant merely bought or sold drugs but did not engage in a conspiracy." *United States v. Cruse*, 805 F.3d 795, 814 (7th Cir. 2015) (quoting *United States v. Love*, 706 F.3d 832, 838 (7th Cir. 2013)). The district court did not abuse its discretion in denying the request for this instruction. *See, e.g.*, *United States v. Dado*, 759 F.3d 550, 567-68 (6th Cir. 2014).

*Multiple-Conspiracy Instruction*. Colbert requested a multiple-conspiracy instruction on the theory that the evidence showed two separate drug conspiracies—one for the distribution of drugs in Grand Rapids and a separate one for the distribution of drugs in Las Vegas. A multiple-conspiracy instruction should be given "when the evidence is such that the jury could within reason find more than one conspiracy." *Warner*, 690 F.2d at 551; *see also* Sixth Circuit Pattern Criminal Jury Instruction 3.08-3.09 (2021). The instruction addresses the danger of "the transference of

---

[3] The instruction Colbert requested read: "A conspiracy requires more than just a buyer-seller relationship between the defendant and another person. In addition, a buyer and seller of a controlled substance do not enter into a conspiracy to distribute a controlled substance simply because the buyer resells the controlled substance to others, even if the seller knows that the buyer intends to resell the controlled substance. The government must prove that the buyer and seller had the joint criminal objective of further distributing the controlled substance to others." PageID 3802; *see also* Seventh Circuit Pattern Criminal Jury Instruction 5.10(A) (2020).

guilt from defendants involved in one conspiracy to defendants in another conspiracy, such that a defendant is convicted for a conspiracy for which he was not indicted." *United States v. Kelsor*, 665 F.3d 684, 695 (6th Cir. 2011) (quoting *Caver*, 470 F.3d at 246). Because a jury could not reasonably conclude the evidence proved multiple conspiracies, the district court did not abuse its discretion by refusing to give this instruction. *See United States v. Maliszewski*, 161 F.3d 992, 1015 (6th Cir. 1998) ("[C]ase law makes plain that evidence of multiple players and multiple locales does not equate with evidence of multiple conspiracies.").

*Other-Acts Instruction.* Colbert also seeks a new trial because the district court refused to give a limiting instruction concerning Daughtry's testimony that she delivered cocaine to a few customers in Las Vegas. *See* Sixth Circuit Pattern Criminal Jury Instruction 7.13 (2021). This limiting instruction advises the jury of the permitted uses that may be made of evidence that the defendant committed crimes, acts, or wrongs "other than the ones charged in the indictment." *Id*. at 7.13(1). The district court denied the request because evidence that Colbert gave Daughtry cocaine with instructions to redistribute it by delivering some personally in Las Vegas was within the scope of the drug conspiracy charged in the indictment. PageID 4869-73. Because Federal Rule of Evidence 404(b) does not apply to conduct encompassed by the charge, *see United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015), the district court did not abuse its discretion in rejecting this limiting instruction.

IV.

A.

At sentencing, Colbert's convictions for the drug distribution conspiracy and the money laundering conspiracy were grouped and his base offense level was determined using the converted drug quantities attributed to him as relevant conduct. *See* USSG §§ 2S1.1 and 2D1.1. The district

court overruled Colbert's objection to the quantity determination but decided to apply a 1:1 ratio for the conversion of the methamphetamine for which he was being held accountable. As a result, the district court found Colbert had a base offense level of 32 (instead of 34). To that, the district court added two levels for the money laundering conviction, USSG § 2S1.1(b)(2)(B); four levels for his role in the offense as a leader or organizer, USSG § 3B1.1(a); and two more levels because "a dangerous weapon (including a firearm) was possessed," USSG § 2D1.1(b)(1). The resulting offense level of 40, together with Colbert's Criminal History Category of III, produced a Guidelines range of 360 months to life imprisonment. After weighing the § 3553(a) factors, however, the district court granted a substantial downward variance and imposed concurrent sentences of 240 months of imprisonment.

B.

Colbert's claim of error in the application of the firearm enhancement under § 2D1.1(b)(1) is a challenge to the procedural reasonableness of his sentence. *See United States v. Seymour*, 739 F.3d 923, 929 (6th Cir. 2014). We review the district court's interpretation of the Guidelines de novo, and its factual findings for clear error. *See United States v. Abdalla*, 972 F.3d 838, 850 (6th Cir. 2020). "[M]ixed questions of law and fact receive 'deferential review' and not de novo review." *Id.* (quoting *Buford v. United States*, 532 U.S. 59, 64 (2001)).

This enhancement relates to the same 9 mm handgun that Colbert was charged with possessing in furtherance of the drug conspiracy. The district court granted Colbert's motion for judgment of acquittal on that charge because the evidence was not sufficient to find beyond a reasonable doubt that the required nexus between the firearm and the crime charged—*i.e.*, that it was possessed for the purpose of aiding or furthering the drug conspiracy. *See United States v. Maya*, 966 F.3d 493, 499-502 (6th Cir. 2020). That did not prevent the district court from

considering the same evidence at sentencing to determine by a preponderance whether the firearm was possessed during the commission of the offense for purposes of the firearm enhancement. *See United States v. Friskey*, 698 F. App'x 252, 257-58 (6th Cir. 2017) (citing *United States v. Miggins*, 302 F.3d 384, 391 (6th Cir. 2002)).

Under USSG § 2D1.1(b)(1), an enhancement is authorized: "If a dangerous weapon (including a firearm) was possessed." The government bears the burden to prove by a preponderance of the evidence that "(1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense." *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020) (citation omitted). "[T]his court has clarified that the weapon need not be possessed during the commission of the actual offense of conviction." *Id.* (citing *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003)). Rather, the government need only show by a preponderance of the evidence "that the dangerous weapon [was] possessed during 'relevant conduct.'" *Faison*, 339 F.3d at 520. Relevant conduct is defined to include "all acts and omissions" of the defendant "that were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(2). Once the government meets that burden, a presumption arises that the firearm was "connected with the offense of conviction." *West*, 962 F.3d at 188. A defendant can overcome this presumption by showing "it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1, cmt., n.11(A).

Colbert does not meaningfully contest the finding that he possessed the firearm found during the search of his apartment; but he argues that the government did not meet its burden to show that he did so during the commission of the conspiracy. Colbert argues that this firearm was seized in September 2018, several months after the last package was intercepted and Howland was arrested in May 2018. But the indictment charged a conspiracy from January 2017 through

September 2018, and Daughtry testified that she saw a firearm in Colbert's apartment while they were dating during the conspiracy. Moreover, the search that found the firearm occurred just after Colbert was stopped after taking a backpack containing $48,000 in cash from the apartment. It was not clearly erroneous to find Colbert possessed the firearm during the relevant conduct.

That showing shifts the burden to Colbert. In determining whether the connection was "clearly improbable," we consider the following factors, no one of which is determinative: the type of firearm; the presence of ammunition; the accessibility of the firearm; the firearm's proximity to drugs, money, or other evidence of drug trafficking; use of the firearm by the defendant, and whether the defendant was actually engaged in drug trafficking. *See United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012) (citation omitted), *abrogated on other grounds by New York Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022). Had there been evidence that Colbert used or carried the firearm, this would be an obvious case for the enhancement (and would have allowed Count 7 to go to the jury).

But, as to the other factors, the firearm was a 9 mm semi-automatic handgun that had been stolen in 2017; it was found loaded with ammunition; it was not stored or secured, but was laying in a basket near drug-packaging materials and could easily be retrieved; and Colbert was actually engaged in the distribution of large quantities of controlled substances from the apartment where it was found. No drugs were found at the time of the search, but a digital scale and multiple cell phones were found in the apartment and the only reason cash was not found was that Colbert had just removed $48,000 from the apartment. Colbert offered no additional evidence to show that a connection to the offense was clearly improbable. *Id*. at 514 ("A defendant must present evidence, not mere argument, in order to meet his or her burden."). Because Colbert failed to rebut the

presumption, the enhancement was properly applied and his sentence was not procedurally unreasonable.

\* \* \*

**AFFIRMED**.